# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00131-CR

**Colton Aaron Pitonyak, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. D-1-DC-05-301918, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Colton Aaron Pitonyak guilty of murder and assessed a fifty-five-year prison term. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2003). In five points of error, appellant contends that: (1) the evidence is legally and factually insufficient to sustain the guilty verdict, (2) the trial court erred by refusing to instruct the jury on the lesser included offenses of manslaughter and criminally negligent homicide, (3) the trial court erred by overruling appellant's motion to suppress evidence, (4) his trial counsel rendered ineffective assistance, and (5) the trial court erred by failing to conduct an inquiry into appellant's competence to stand trial. We will overrule these points of error and affirm the judgment of conviction.

BACKGROUND

**The disappearance of Jennifer Cave**

On Thursday, August 18, 2005, Sharon Cave and Jim Sedwick drove to Austin from their home in Corpus Christi to look for Sharon's daughter, Jennifer Cave. Jennifer, who was twenty-one years old, had been living in Austin for about two years. Sharon and Jennifer were very close, and they spoke to each other by telephone daily, often several times. On Monday, August 15, Jennifer had told her mother that she was going to interview the next day for a part-time job at an Austin law firm. On Tuesday, Jennifer called Sharon to tell her that she had gotten the job. Later that same day, Jennifer called again to say that she had been offered full-time employment at the firm. Sharon testified that Jennifer was extremely excited by the prospect of this new job. Jennifer and Sharon spoke again at 8:30 p.m. Tuesday night. Jennifer was at the apartment she shared with Denise Winterbottom, doing laundry and preparing herself for the next day, which was to be her first full day at the law firm. Still excited about the new job, Jennifer told her mother that she was going to wear the new pants suit that Sharon had recently bought for her. This was Sharon's last conversation with Jennifer.

On Wednesday afternoon, August 17, Sharon received a telephone call at her office from William Thompson, one of the attorneys at the law firm that had employed Jennifer. Thompson asked Sharon if she had spoken to Jennifer that day. When Sharon said that she had not, Thompson told her that Jennifer had not come to work that day and that she was not answering her telephone. Someone from the firm had also gone to Jennifer's apartment, but she was not there. Sharon immediately began calling Jennifer's cell phone, but all of her calls went "straight to her

2

voicemail." Believing that Jennifer had merely misplaced her phone but nevertheless worried, Sharon called her cell phone service provider. From the telephone company, she obtained a list of the numbers that had called or been called from Jennifer's phone, starting with Jennifer's last call at 1:08 a.m. on Wednesday and going back several hours. Sharon then began calling the numbers that appeared on the list most frequently, hoping to find someone who might know Jennifer's whereabouts.

One of the numbers Sharon called belonged to Michael Rodriguez. Rodriguez testified that he had spoken to Jennifer by telephone three times on Tuesday night and Wednesday morning. In the first call, at 10:30 Tuesday night, Jennifer told Rodriguez that she was going to "hang out" with a friend named Colton, who Rodriguez did not know. In a second call around midnight, Jennifer said that Colton was "upset." In the third call, at 1:00 a.m., Jennifer told Rodriguez that Colton was upset because he had lost his cell phone, that he had tried to break out the window of a parked car, and that he was at that moment urinating on another vehicle. Rodriguez testified that Jennifer "didn't sound like she was in trouble or anything," and that he "assumed he [Colton] was just intoxicated and doing something stupid."

Sharon reached Rodriguez on her office telephone. While she was speaking to Rodriguez, appellant, who she had also been attempting to reach, called her cell phone. Sharon testified, "I asked him [appellant] if he had seen Jennifer, if he had talked to Jennifer, and he said no. Mr. Rodriguez said, 'That's not true. She was with him.' So I had two phone conversations going at the same time." When Sharon told appellant that she was "on the phone with somebody that says she was with you," appellant acknowledged that he had seen Jennifer downtown but claimed

3

that he did not know where she now was. Sharon testified, "Michael was still on the phone and Michael just said he is lying. He was with her last night. He is lying." After speaking to Rodriguez and appellant, Sharon called Jennifer's roommate. Winterbottom told Sharon that when she went to bed on Tuesday night, Jennifer had been washing clothes at the apartment, but when she awoke on Wednesday morning, Jennifer was gone.

Sharon began to call "places in Austin, hospitals. I think I even called the morgue. And I couldn't find anything, so I called the police station." The person she spoke to at the Austin police department told her that Jennifer had not been missing long enough to file a missing persons report. He did open a case file and gave Sharon the number. Sharon gave the police the license plate number of Jennifer's car and other personal information about her daughter.

By this time, it was about 5:00 p.m. on Wednesday afternoon. Sharon called Sedwick at his work and told him "there is something very wrong. There is something wrong with Jennifer." Sharon and Sedwick met at their home, and they continued to make telephone calls in an attempt to find someone who might have seen or spoken to Jennifer. One of the persons Sedwick called was appellant, who did not answer. Sedwick left a "stern" message telling appellant to "call us back, we are looking for Jennifer." At about 7:30 p.m., appellant returned the call. Sharon answered. She testified, "I said, Colton, please, do you know anything about Jennifer, and he said, dude, I'm eating pizza with my friends. Leave me alone. I don't know where she's at." Then he hung up.

Appellant was not a total stranger to Sharon and Sedwick. Sharon testified that Jennifer had spoken to her about appellant soon after she moved to Austin. Sharon said that she later learned that Jennifer and appellant were using drugs. She testified that she spoke to Jennifer about

4

this and that Jennifer seemed to listen. Sharon was asked if she had suspected that Jennifer's failure to show up for work on August 17 was the result of "a bad bout with alcohol or drugs." She replied, "No, I did not think that that was the problem. She was too excited about her new job."

On Thursday morning, August 18, Sharon and Sedwick called the Austin police and spoke to Detective Kathleen Hector in the missing persons office. Sharon told Hector all that had happened the previous day, including Jennifer's failure to appear for work and Sharon's fruitless attempt to locate her. Sharon also gave the detective the names and numbers of the people she had called. Hector assured Sharon that the police would "check it out" and would "look for her license and see if there was anything like that, if her car was in the impound lot or anything like that." Sharon and Sedwick then decided to drive to Austin to continue their search for Jennifer.

Sharon and Sedwick left Corpus Christi at 11:00 a.m. on Thursday morning. When they were near San Antonio, Hector called Sharon on her cell phone to report that Jennifer's car had been found at 2529 Rio Grande, near the University of Texas campus.[1] Hector told Sharon that appellant lived at that address, in apartment 88. When Sharon and Sedwick arrived in Austin at about 4:00 p.m., they immediately drove to 2529 Rio Grande. They were met there by Sharon's daughter Vanessa, who had driven to Austin from her home in Dallas to help look for her sister Jennifer. 2529 Rio Grande is a large condominium complex called the Orange Tree. They found Jennifer's car parked in the street and appellant's apartment on the second floor. Hector's business card was on both the car and the apartment door. Sharon and Sedwick found nothing unusual at apartment 88. They knocked on the door and windows, calling out Jennifer's name, but there was

---

[1] In the reporter's record, the address also appears as 2525 Rio Grande.

no response. After about an hour, they left the Orange Tree and went to a hotel. Sharon, who had a spare key, drove Jennifer's car to the hotel. She hoped that if Jennifer "came out and saw that her car was missing, that the first thing she would do is call me or call the police."

While at the hotel, Sharon called directory assistance for Arkansas. She had learned during a telephone conversation with one of Jennifer's friends that appellant was from Arkansas, and she had seen a car with Arkansas license plates at the Orange Tree. Sharon managed to reach appellant's father. She testified, "I told him that my daughter was missing and that I was looking for her and that the last person that we thought she was with was Colton." According to Sharon, appellant's father told her that "Colton had called and asked if he could take Jennifer to dinner and use his mother's credit card. And so it confirmed that he and Jennifer had been somewhere on Tuesday night."

Sharon and Sedwick decided to return to the Orange Tree. Fearing that she had made a mistake by moving Jennifer's car, Sharon drove it back and parked it where she had found it. Joined by Vanessa and a friend, Sharon and Sedwick knocked on appellant's door but got no response. Although Sharon had been told by Hector that there was nothing the police could do at this time, she called the police again and Officer Guillermo Salinas was dispatched to the Orange Tree. Salinas testified that he arrived at 8:36 p.m. Sharon told Salinas that her daughter was missing and that she thought that she might be in apartment 88. Salinas examined Jennifer's car and appellant's car, and he knocked on the apartment door. The officer spoke to someone who told him that the apartments were individually owned condominiums and that there was no building manager who would have a master key. After Salinas consulted with his superiors by radio, he told Sharon

6

and Sedwick that he was not authorized to force his way into the apartment. Sedwick asked the officer "what would happen if he [Sedwick] forced entry." Salinas advised Sedwick that if he broke in, he could be charged with criminal trespass. Sedwick then asked Salinas if the police would be willing to enter the apartment if Sedwick hired a locksmith to open the door. Salinas checked with his supervisor, who said "no." Salinas left the scene approximately forty-five minutes after he arrived.

**The discovery of the body**

Sharon testified that after Salinas left, "We were desperate. We didn't know what to do. The police were telling us that they were sorry, they couldn't help us. We didn't know what to do." She said that she believed that it was necessary to get inside appellant's apartment "[b]ecause it's the only thing I had of where Jennifer might be and I had to start somewhere. I had to look for her. . . . We couldn't find her and he was the link. He was how—he was the last person to be with her. Her car was there."

Sharon and Sedwick decided to call a locksmith, who came to the apartment and attempted to open the door without success. As Sharon and Sedwick stood outside appellant's apartment after the locksmith had departed, Sharon noticed that one of the windows was cracked. She "went over with my fingernail and I chipped the glass out a little bit." After making this hole in the windowpane, Sharon used a temple piece from a broken pair of sunglasses to open the lock. Sedwick then opened the window and climbed into the apartment.

As he entered the apartment through the window, Sedwick called out, "I'm here to help. Please don't hurt me. Please don't shoot me. I'm looking for you, Jennifer." Using the

7

flashlight that he kept in his car, Sedwick began to look around the small studio apartment. The room was in "complete disarray." There was no one on the couch, in the bed, or in the kitchen area. Sedwick found a light switch and turned it on. "[A]t that point," he testified, "I smelled something." Sedwick walked down a short hallway to the bathroom. He said, "I opened that door and the smell really hits me. I shine my light in there. I am seeing something. I flip the light on and there is a body in the bathtub." Sedwick described what he did next: "I'm trying to figure out what I'm seeing here . . . . I started yelling, call the police, call 911. I immediately identified that it was a decapitated body. I was seeing that and I saw the hacksaw laying there. So I went to the front door and I unlocked the front door and I went out. And Sharon's yelling, is it her, is it her, and that's when I said, I think so."

Outside the apartment, Vanessa had the 911 operator on the phone. Sedwick spoke to the operator, telling him, "I have got a body in a bathtub full of blood. I really need some help over here. I think I got asked one of those really silly questions is there a pulse or something like that." After speaking to the 911 operator, Sedwick reentered the apartment and returned to the bathroom. He testified that he "couldn't positively identify her, obviously," but "she had on this kind of greenish dress that I thought I recognized." Sharon testified, "I remember wanting to go in and Jim wouldn't let me. He said, no, no, you can't, you can't." She added, "He said he thought it was Jennifer because he saw her feet. That's all he would say. He just said—I said, is it Jennifer, is it Jennifer, is it Jennifer? He said, I think so, I saw her feet. He saw her feet. He saw her feet."

Officer Richard Barbaria and his partner, Officer Chris Clark, were on routine patrol that night in the West Campus area. Barbaria testified that at 10:15 p.m., they were dispatched to

8

the intersection of Rio Grande and West 25th Street. Barbaria explained that when the 911 call center "is getting information fed to them and it sounds kind of serious," they "will disperse some information to the patrolmen to have us heading in that area and then slowly they will update us as to what is going on." As Barbaria and Clark drove toward the indicated location, they were told by the dispatcher to go to the Orange Tree condominiums at 25th and Seton where a woman in apartment 8 was reported to be "possibly overdosed and in trouble." Within minutes, Barbaria and Clark were at the Orange Tree and found apartment 8. As they were pounding on the door, they noticed the arrival of ambulances and fire trucks and saw emergency personnel going to apartment 88. Realizing that they had been given the wrong apartment number, Barbaria and Clark went to the other apartment. Barbaria testified, "I was still under the belief that the female [in the apartment] was alive or at least in critical condition from an overdose." As Barbaria neared apartment 88, he was approached by Sedwick. The officer "immediately assumed that he is related to or knows well the woman who was injured inside, the possible overdose that I had at that time." Sedwick told Barbaria that "the female was dead and that she was inside" the apartment. Barbaria testified that Sedwick's statements "had no meaning to me at the time because I did not see the victim as of yet."

Following a group of fire fighters, Barbaria entered the apartment. He noticed that it was "messy and unkempt," "a typical college student's apartment." Barbaria followed the fire fighters to the bathroom. He testified, "I am usually used to coming to a scene where it is an overdose or something, the firemen are in front of me and I usually watch them work and then I look for evidence of narcotics." But on this night, "I knew something was wrong because they were going up to the bathroom and doing like an about face. You know, you have all these firemen carrying all

9

their medical gear . . . and they are not going into the bathroom. . . . I am like, what is going on?" Barbaria entered the bathroom and found "a female body with the head missing and the hands missing. It was propped up in the bathtub facing the doorway." Barbaria noticed a small hacksaw on the body's chest, and he remembered "seeing portions of flesh and blood. It was used to cut the body." The officer also saw a plastic garbage bag on the bathroom floor. "I didn't bother looking at it or touching it because I knew—just by the shape of the bag, I knew what parts were in the bag." After making sure that no one else was inside, Barbaria and Clark closed the apartment and contacted homicide detectives to report what they had found.

The body in appellant's bathtub was Jennifer Cave. As Barbaria had suspected, Jennifer's severed head and hands were in the plastic garbage bag. It was determined during the autopsy that Jennifer was killed by a single gunshot. The bullet passed through her right arm and reentered her body through the ribs on her right side. The bullet then passed through her right lung and punctured the aorta, which caused her death. The bullet was found in the body just under the skin on the left side of her back. In addition to the bullet wound, there were numerous stab wounds to the body. There were eighteen stab wounds to the face and neck, and another cluster of ten stab wounds on the left shoulder and right breast. The medical examiner testified that these wounds were inflicted after death. Finally, a second bullet was found in Jennifer's head when the body was x-rayed. The medical examiner testified that this wound was also post-mortem. The bullet had entered through the severed neck and traveled upward, lodging in the cranial vault.

**Other evidence**

The two bullets found in Jennifer's body were fired from a .380 semiautomatic pistol that was found in appellant's car. Three cartridge casings fired from that pistol were found in

10

appellant's apartment; the third bullet was never found. In addition to the bloody hacksaw found on Jennifer's body, a knife and a machete stained with Jennifer's blood were found in appellant's apartment.

Several witnesses testified to having seen and spoken to Jennifer and appellant at a bar on Sixth Street in downtown Austin on the night and early morning of August 16 and 17. Jennifer did not appear to be intoxicated, but appellant appeared to be under the influence of alcohol or drugs. Two of these witnesses heard appellant mention purchasing cocaine.

One of appellant's neighbors at the Orange Tree, Nora Sullivan, testified that appellant came to her apartment with a pistol at 3:00 a.m. on Wednesday morning. Appellant told Sullivan that he had just been in a fight with "some Mexican guys" at his apartment and there had been an exchange of gunfire. Sullivan had heard no gunshots and did not believe appellant, although she did notice that he had what appeared to be a smudge of blood on his forearm. Sullivan testified, "I could tell he had been drinking, so I just thought he was rambling on some story he made up."

The owner of a hardware store a few blocks from appellant's apartment testified that appellant was in the store shortly after 3:00 p.m. on Wednesday afternoon. Appellant purchased a hacksaw, shop towels, latex gloves, dust masks, 55-gallon drum liners, ammonia, carpet cleaner, and odor eliminator. Appellant told the witness that he was going to use the saw to cut up a turkey. The witness said that he smelled alcohol on appellant's breath, but that appellant did not appear to be intoxicated. The evidence shows that after leaving the hardware store, appellant stopped at a Burger King and ordered a hamburger, fries, and a drink. The remains of this meal were found by the police at appellant's apartment.

11

Scott Engle testified that he and Jennifer lived together for several months in early 2005, that they remained friends after Jennifer moved out of his apartment, and that they often spoke to each other. Through Jennifer, Engle was also acquainted with appellant. On Wednesday afternoon, August 17, Sharon Cave called Engle on the telephone and told him that Jennifer was missing and had last been seen with appellant. Engle testified that after he spoke to Sharon, he called appellant and left a message. Appellant returned Engle's call within fifteen minutes. Appellant told Engle that he had not seen Jennifer since having dinner with her on Tuesday night. Engle told appellant that Jennifer's car was parked at his apartment and that "more than likely the cops would be arriving there shortly." Appellant replied, "That bitch is going to get me arrested."

Appellant left Austin with a woman named Laura Hall on Wednesday night, in Hall's automobile. They drove to Del Rio, then crossed into Mexico and made their way to Piedras Negras. They checked into a motel in that city on Friday, August 19. They were arrested at the motel by Mexican police four days later and turned over to United States marshals. Marshal Vincent Bellino testified that when he told appellant that he was being arrested for murder, appellant said, "If this is a murder charge, then I know exactly what this is about."

**Appellant's testimony**

Appellant was twenty-four years old at the time of the trial. He testified that he graduated from high school in Little Rock, Arkansas, in 2001. That fall, he entered the University of Texas on an academic scholarship. Appellant did well in school at first, but he soon began taking drugs and drinking to excess. Appellant was arrested for driving while intoxicated in December

12

2002 and suspended from the university. For the next two-and-a-half years, appellant was in and out of the university and the local community college, but he continued to drink heavily and use drugs, and he rarely went to class.

Appellant testified that he met Jennifer Cave in the summer of 2004. He described their relationship as "really good friends" and not romantic. He said, "I knew I could always call her or she could call me and we would be there to help each other out." He added, "I cared about her a lot. She was my best friend."

That fall, appellant was arrested for possession of cocaine. As part of an agreement by which the offense was reduced to a misdemeanor, appellant entered a residential drug rehabilitation center. He was released after one month, and he began using drugs and drinking two days later. It was at about this time that appellant met Laura Hall. Appellant testified that Hall would come to his apartment and they "would stay up and drink and do drugs together." He said that Hall was in love with him, but he did not share these feelings.

Appellant testified that during the summer of 2005, he was drinking a case of beer and a liter of vodka every day. In addition to the drinking, he was taking Xanax and using cocaine. Appellant was also buying and selling cocaine and other drugs. In July 2005, appellant was given the .380 pistol by "some guys who owed me some money" for drugs. They also gave him a box of ammunition. Appellant testified that he never loaded the weapon and that he threw away the ammunition. In August, appellant sold the pistol (without ammunition) to a friend of Hall's named Jason. A few days later, on August 13, Jason visited appellant at his apartment. He asked to borrow appellant's car and offered to leave the pistol with appellant as assurance that he would return. Appellant agreed to this arrangement. The pistol was left either on the kitchen counter or in a

kitchen drawer. Appellant claimed that he "didn't want to mess with it" and did not know that the pistol was loaded.

Appellant testified that Jennifer called him shortly after 9:00 p.m. on Tuesday night, August 16, 2005. "She told me she got a new job that day. She was excited that she got promoted her first day and she was just kind of catching me up on things. And she said do you want to go downtown and get a drink and get something to eat. I said yeah, if you will come pick me up, we will go." Appellant had been drinking vodka steadily since about 5:00 p.m., and he had also taken several Xanax pills. He recalled going to a restaurant on Sixth Street with Jennifer, where he bought a drink, but he testified that this was the last thing he remembered about that night. Appellant said that his next memory was waking up in his apartment the following morning.

Telephone records showed that appellant made several calls between 5:30 and 6:00 a.m. Wednesday morning, but appellant could not remember whether he made the calls before or after he discovered Jennifer's body. He testified that at some time that morning, "I went back to the bathroom to use the restroom and she was laying in the bathtub." Appellant said that he knew when he saw her that Jennifer was dead. Asked why he did not call the police, appellant replied, "I was scared. I didn't know what happened. I wanted to—I panicked."

Appellant testified that he was certain that he shot Jennifer even though he had no recollection of having done so. Appellant said that "[e]verything points to it," and "I can't think of any other thing that happened." He insisted, however, that "[t]here is no way it would have been on purpose."

Appellant said that after he discovered the body, he called Hall, one of the persons he had spoken to earlier, and told her not to come to the apartment as she had planned to do. Hall insisted on coming, however, and she arrived at about 8:00 a.m. After appellant showed Hall

14

Jennifer's body, she asked, "[W]hat are we going to do?" Appellant said that he and Hall began to discuss the possibility of cutting up the body. Asked why he would consider doing this, appellant answered, "I wanted to—to get rid—get rid of the body. I don't know." Appellant testified that he did not remember personally cutting the body. He also claimed that he did not see Hall cut the body, but he remembered her telling him that "what she was trying wasn't working, that she needed some things." Appellant said that he "assumed" that this was a reference to "cutting up the body" with the knife and machete that he had in his apartment. Appellant's counsel asked him, "Truthfully, son, didn't you know that Laura was in the process of seeing to it that that body was cut up into several different pieces? Isn't that correct?" Appellant answered, "Yes, sir." Appellant testified that Hall gave him the list of items to purchase at the hardware store. He knew that the hacksaw and other supplies were to be used to cut up Jennifer's body. He said that after returning to the apartment with the saw, "I tried to go in there and do some cutting, but I couldn't."

Appellant was asked if he fired the shot into Jennifer's severed head. He said, "I did not." Asked who did, appellant answered, "I was not there when it happened. I can only assume." Appellant said that no one else was present except Hall.

Appellant testified that he drank heavily throughout Wednesday and also took several Xanax pills. He remembered the telephone calls from Sharon Cave on Wednesday, and he admitted that he was rude to her on both occasions. That night, when Sharon told him that she had called the police, appellant "panicked." He "started throwing some clothes in a bag and said we need to get out of the apartment. We need to go somewhere and figure out what happened." He said that he and Hall did not have any definite plans when they left his apartment on Wednesday night, but after they

15

drove to Hall's apartment so she could get some clothes, "she said something about going to Mexico and that's where we ended up."

## SUFFICIENCY OF THE EVIDENCE

Appellant contends that the evidence is legally and factually insufficient to support the jury's determination that he intentionally or knowingly killed Jennifer Cave. When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (legal sufficiency); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (factual sufficiency).

### Legal sufficiency

In a legal sufficiency review, all the evidence is reviewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. It is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Id*.

Appellant concedes that he shot Jennifer, but he asserts that there is no evidence that he intended to cause her death. Appellant argues that he and Jennifer were friends and that he had no reason to kill her. He further argues that the State failed to negate the possibility that the pistol accidentally discharged. Appellant argues that in the absence of any showing of motive or any direct evidence of the manner in which he shot Jennifer, the jury could not rationally find beyond a reasonable doubt that he intentionally or knowingly killed her.

16

A culpable mental state must often be proved circumstantially, and the jury is entitled to consider events that occurred before, during, and after the commission of the offense. *Mouton v. State*, 923 S.W.2d 219, 223 (Tex. App.—Houston [14th Dist.] 1996, no pet.). In a murder prosecution, the intent to kill may be inferred from the defendant's use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death could not result. *Ross v. State*, 861 S.W.2d 870, 873 (Tex. Crim. App. 1992); *Godsey v. State*, 719 S.W.2d 578, 580-81 (Tex. Crim. App. 1986). When, as in this case, the evidence shows that a deadly weapon was used in a deadly manner, "the inference is almost conclusive that [the defendant] intended to kill." *Godsey*, 719 S.W.2d at 581 (quoting *Hatton v. State*, 21 S.W. 679 (Tex. Crim. App. 1893)).

The State did not have to prove that appellant had a motive for killing Jennifer. *See Clayton v. State*, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007) (stating that motive is not element of murder, although it may be circumstance indicative of guilt). Looking at the evidence in the light most favorable to the verdict, we must assume that the jury rejected the possibility that the shooting was an accident or the result of reckless or negligent conduct, and that the jury instead drew the permissible inference that appellant shot Jennifer with a deadly weapon intending to kill her. The jury could also infer an intent to kill from appellant's conduct following the shooting. *See Mouton*, 923 S.W.2d at 223. The jury could reasonably conclude that a person who had just unintentionally shot his best friend would not go next door and tell his neighbor that he had had an exchange of gunfire with some strangers, and that he would not thereafter attempt to dismember the dead body before fleeing to Mexico. We hold that the evidence is legally sufficient to support the jury's finding beyond a reasonable doubt that appellant intentionally killed Jennifer Cave.

**Factual sufficiency**

In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson*, 23 S.W.3d at 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

Appellant argues that to find that he intended to kill Jennifer, the jury had to disregard "overwhelming evidence" that he did not know that the gun was loaded when he pulled the trigger. Appellant testified that he never loaded the pistol after originally acquiring it, threw away the ammunition, and sold it to Jason unloaded. Appellant also testified that after Jason left the pistol at his apartment on Saturday, August 13, he did not examine the weapon to determine if it was loaded. He also cites the testimony of defense firearms expert Edward Hueske, who testified that the pistol in question did not have a safety or a loading indicator to show that a bullet is in the firing chamber. Appellant asserts that even if he should have checked the weapon when he received it from Jason, his failure to do so was merely negligence or recklessness. He urges that because he did

18

not know that the pistol was loaded, he could not have intended to kill Jennifer even if he pointed the pistol at her and pulled the trigger.

Appellant also argues that if he had intended to kill Jennifer, he would not have shot her in the side. Citing no authority or evidence, appellant asserts that a gun shot in the side "normally does not produce mortal wounds." Appellant also refers to Rodriguez's testimony that he did not sense that Jennifer was in any danger when he spoke to her by telephone early Wednesday morning, not long before the shooting. Appellant contends that in light of Rodriguez's testimony and the angle from which Jennifer was shot, "the most plausible conclusion from the evidence was that [he] accidentally shot her."

The State's firearms expert, Greg Karim, testified that the pistol had a "trigger safety" so that if the trigger "was snagged at the top, the trigger is not going to move." Karim also testified that the pistol was so designed that it would not discharge if dropped. Karim said that the trigger pull for the gun was eight to ten pounds, which is typical for a double action weapon and not abnormally low.

The State also points to the testimony of appellant's neighbor, Sullivan, who testified that appellant had a pistol with him when he came to her apartment at 3:00 a.m. Wednesday morning and told her about the alleged shoot-out in his apartment. Sullivan testified that while appellant was in her apartment, he took the magazine out of the pistol to make sure it was unloaded. She said, "I think he might have said I'm unloading it. I didn't know what he was doing." The State further notes appellant's admission, during cross-examination, that he took the pistol with him "once or twice" when purchasing drugs. Given this evidence and appellant's obvious motivations in

19

testifying, the jury could reasonably discount appellant's claim that he was unfamiliar with the pistol and did not know that it was loaded.

Appellant dismisses the State's proof of intent to kill as "mere speculation." But appellant's assertion that he did not intend to kill Jennifer is equally speculative. Because appellant claimed that he did not remember shooting Jennifer and there were no other witnesses, the jury had to infer appellant's culpable mental state from the known circumstances. As noted above, the jury could reasonably infer an intent to kill from appellant's use of a deadly weapon and from his conduct following the shooting. Whatever appellant's motive for the shooting, the jury could reasonably conclude that it arose after he and Jennifer returned to his apartment early Wednesday morning and that there was no reason for Jennifer to have felt herself in any danger before then. And the jury could have found a number of plausible reasons other than accident to explain the angle of the fatal shot, such as appellant's intoxication, his lack of skill with the pistol, or mere coincidence. Viewing all the evidence in a neutral light and giving the jury's verdict the deference it is due, we hold that the evidence supporting the verdict is not so weak as to make the finding of intentional murder clearly wrong or manifestly unjust and that the verdict is not against the great weight and preponderance of the available evidence.

Point of error one is overruled.

## LESSER INCLUDED OFFENSES

Appellant contends that the trial court erred by refusing to instruct the jury on the lesser included offenses of manslaughter and criminally negligent homicide. *See* Tex. Penal Code Ann. §§ 19.04, .05 (West 2003). There is a two-part test for determining if an instruction on a lesser

20

included offense should be given: (1) the lesser offense must be included within the proof necessary to establish the offense charged, and (2) there must be some evidence that would permit the jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993).

The only distinction between an intentional or knowing murder and the lesser offenses of manslaughter and criminally negligent homicide lies in the culpable mental state accompanying the homicidal act. *Navarro v. State*, 863 S.W.2d 191, 204 (Tex. App.—Austin 1993), *pet. ref'd*, 891 S.W.2d 648 (Tex. Crim. App. 1994). Thus, there is no question that manslaughter and criminally negligent homicide are included within the proof necessary to establish the charged offense in this case. *See id*. at 647. We must determine if there is evidence from which the jury could have rationally found that appellant was guilty only of recklessly or negligently causing Jennifer Cave's death.

Appellant concedes that his claimed inability to remember the shooting did not entitle him to instructions on the lesser offenses. *See Schroeder v. State*, 123 S.W.3d 398, 401 (Tex. Crim. App. 2003). Further, it is not enough that the jury might have disbelieved crucial evidence pertaining to the charged offense. *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). Rather, there must be some evidence directly germane to the included offenses for the jury to consider. *Id*. In other words, it is not sufficient that the jury might have chosen to disbelieve that appellant intentionally or knowingly killed Jennifer; there must be evidence that appellant was guilty only of acting recklessly or with criminal negligence.

Appellant contends that his testimony that he did not examine the pistol in advance to determine whether or not it was loaded is evidence from which the jury could find that, when he

21

pointed the pistol at Jennifer, he either consciously disregarded a substantial and unjustifiable risk that death would result or that he ought to have been aware of that risk. *See* Tex. Penal Code Ann. § 6.03(c), (d) (West 2003) (defining recklessness and criminal negligence). But appellant's testimony that he had not checked to see whether the pistol was loaded, even if believed by the jury, is not evidence that appellant was guilty only of manslaughter or criminally negligent homicide. Appellant could have intended to kill Jennifer when he pointed the pistol at her and pulled the trigger even if, when he did so, he did not know to a certainty that the pistol was loaded.

Appellant also urges that the evidence regarding his alcohol and drug intoxication on the night of the shooting raises the issue of whether he was capable of acting intentionally or knowingly. Under penal code section 8.04(a), however, evidence of voluntary intoxication cannot be used to negate the culpable mental state of a crime. Tex. Penal Code Ann. § 8.04(a) (West 2003); *Hawkins v. State*, 605 S.W.2d 586, 589 (Tex. Crim. App. 1980).

Finding no evidence from which the jury could have rationally found that appellant, if guilty at all, was guilty only of manslaughter or criminally negligent homicide, we hold that the trial court did not err by refusing to instruct on these lesser offenses. Point of error two is overruled.

**MOTION TO SUPPRESS EVIDENCE**

A warrant to search appellant's apartment was issued at 4:40 a.m. on Friday morning, August 19, about six hours after Jennifer Cave's body was discovered. A warrant to search appellant's automobile was issued five hours later. Appellant moved to suppress the evidence seized pursuant to these warrants on the ground that information crucial to the finding of probable cause

22

to search was obtained unlawfully. In his third point of error, appellant contends that the trial court erred by overruling the motion to suppress.

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *Villareal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). In this review, we defer to the trial court's factual determinations but review de novo the court's application of the law to the facts. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We will sustain the trial court's ruling admitting evidence if the ruling is reasonably supported by the record and correct on any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

**Appellant's contention**

Appellant's challenge to the searches is based on Texas's statutory exclusionary rule, which provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of [Texas or the United States] shall be admitted in evidence against the accused on the trial of any criminal case." Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005). This exclusionary rule applies to evidence unlawfully obtained by any person, whether or not the person is a government agent. *State v. Johnson*, 939 S.W.2d 586, 587 (Tex. Crim. App. 1996). Appellant contends that Jim Sedwick committed a criminal trespass when he entered appellant's apartment through the window. *See* Tex. Penal Code Ann. § 30.05(a)(1) (West Supp. 2007) ("A person commits an offense if he enters . . . property . . . or . . . a building of another without effective consent and he had notice that the entry was forbidden"). Appellant argues that because the search warrants were issued on the basis of information Sedwick unlawfully obtained

as a result of his criminal trespass, the evidence seized under the warrants must be excluded pursuant to article 38.23(a).

A search warrant may not be procured lawfully by the use of unlawfully obtained information. *Brown v. State*, 605 S.W.2d 572, 577 (Tex. Crim. App. 1980). When a search warrant is issued on the basis of an affidavit containing unlawfully obtained information, the evidence seized under the warrant is admissible only if the warrant "clearly could have been issued on the basis of the untainted information in the affidavit." *Id*. If the tainted information was clearly unnecessary to establish probable cause for the search warrant, then the defendant could not have been harmed by the inclusion of the tainted information in the affidavit. *Castillo v. State*, 818 S.W.2d 803, 805 (Tex. Crim. App. 1991), *overruled on other grounds*, *Torres v. State*, 182 S.W.3d 899, 901-02 (Tex. Crim. App. 2005). This rule has been held to apply under article 38.23(a) when a search warrant contains information obtained by the unlawful act of a private person. *Martin v. State*, 67 S.W.3d 340, 343 (Tex. App.—Texarkana 2001, pet. ref'd); *State v. Johnson*, 896 S.W.2d 277, 292 (Tex. App.—Houston [1st Dist.] 1995), *aff'd*, 939 S.W.2d 586, 588 (Tex. Crim. App. 1996).

The probable cause affidavits supporting the two search warrants were prepared by Detective Mark Gilchrest and signed by Detective Douglas Skolaut, both members of the Austin Police Department's homicide unit. The two affidavits are substantially identical. The pertinent portion of the two affidavits described: (1) Jennifer's disappearance, the efforts that had been made to find her, and appellant's connection to her disappearance; (2) Sedwick's entry into appellant's apartment through the window and his discovery of Jennifer's body; and (3) Barbaria's discovery of the body when he responded to Sedwick's 911 emergency call.

24

**The trial court's ruling**

Appellant's motion to suppress was overruled following a pretrial hearing at which Sedwick, Sharon Cave, and several Austin police officers testified regarding the disappearance of Jennifer Cave, the ensuing search, and Sedwick's discovery of her body after forcing open the window and entering appellant's apartment. After hearing the evidence and the arguments of counsel, the trial court agreed with the State that Sedwick's entry into appellant's apartment was not unlawful and, moreover, that the discovery of Jennifer's body was inevitable. The court made the following findings and conclusions:

> The Court finds the actions on the part of Sharon Cave and Jim Sedwick were not the result of any assistance or direction governed by any law enforcement agent or authority. They were not agents in any form or fashion. Their conduct was solely a decision of the aunt [sic], and with no assistance or direction from the Austin Police Department or any law enforcement agent or authority. The Motion to Suppress is denied on that ground.

> The next issue is the emergency doctrine. . . .

> . . .

> It's clear that the Court's finding is that Jennifer Cave was missing, whereabouts unknown. Through her [Sharon Cave's] own efforts, she discovered, in conversations with Michael Rodriguez, that the last person she, being the deceased, had contact with, was the accused in this case.

> She found the location of the accused's residence, went there, found her daughter's automobile, made efforts to determine if she was at that location.

> The Court finds that, as viewed through—through the standpoint and the view of Sharon Cave and Jim Sedwick, their conduct was reasonable. There was an emergency, in their minds, that existed. Their daughter could have been injured/harmed, in some way, unable to communicate with them, that there was an emergency situation in their minds. They were justified in entering the premises under the emergency doctrine. They reasonably believed that Jennifer Cave was in there and in need of immediate aid or assistance.

25

Motion to Suppress is denied with regard to a finding of this Court that an emergency truly did exist that justified the entry.

With regard to the question of necessity, assuming that someone may disagree with this Court and find that the crime of criminal trespass did, in fact, occur—the Court is assuming that I will be the fact finder as to whether any defense would be applicable in this case. And the Court finds that if someone takes exception to the Court's ruling here and finds that a crime of criminal trespass did, in fact, occur—the Court finds that as the finder of fact, that a necessity defense would be applicable, that the entry made was immediately necessary to avoid any imminent harm, and that it would be applicable. And the Motion to Suppress is denied on that ground.

The Court further finds that the testimony at the hearing establishes . . . that there was the odor of decomposition in the apartment when the apartment was entered. The Court understands that there are two people who had smelled an odor and one who didn't. But it is a finding of fact that the odor did exist, and that it's reasonable to conclude that in a—in a short period of time that that odor would have emanated to the apartments surrounding or near the apartment where the body was found, and that the inevitable discovery doctrine is found as applicable by the Court in this case. The Motion to Suppress is denied on all grounds.

## Inevitable discovery

Appellant challenges the three legal conclusions on which the trial court based its decision to overrule the motion to suppress. Appellant quickly disposes of the court's inevitable discovery rationale, correctly pointing out that inevitable discovery is not an exception to the article 38.23 exclusionary rule. *State v. Daugherty*, 931 S.W.2d 268, 273 (Tex. Crim. App. 1996). The State concedes that article 38.23 does not incorporate the inevitable discovery doctrine, although it argues that the law should be otherwise. That is an argument for the court of criminal appeals.

## Emergency doctrine

Appellant argues that the emergency doctrine is an exception to the Fourth Amendment search warrant requirement and has no application to the actions of a private person

who was not acting as a state agent. *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921) (holding that Fourth Amendment protection against unreasonable searches and seizures applies only to government agents). But the court of criminal appeals has recently held that for the purpose of applying the article 38.23(a) exclusionary rule, the actions of a private person are to be judged according to the standards that apply to police officers. The court held:

> [T]he plain language and history of Article 38.23 lead to an inescapable conclusion: if an officer violates a person's privacy rights by his illegal conduct making the fruits of his search or seizure inadmissible in a criminal proceeding under Article 38.23, that same illegal conduct undertaken by an "other person" is also subject to the Texas exclusionary rule. If the police cannot search or seize, then neither can the private citizen. Conversely, if an officer may search or seize someone under the particular circumstances, then the private citizen's equivalent conduct does not independently invoke the Texas exclusionary rule, and the evidence obtained by either the officer or the private person may be admissible.

*Miles v. State*, 241 S.W.3d 28, 36 (Tex. Crim. App. 2007) (footnote omitted). In other words, under article 38.23(a), "a private person can do what a police officer standing in his shoes can legitimately do, but cannot do what a police officer cannot do." *Id*. at 39. Therefore, although the Fourth Amendment warrant requirement applies only to police officers and other agents of the government as a matter of constitutional law, *Miles* effectively applies the Fourth Amendment warrant requirement—and the exceptions to that requirement—to the conduct of private persons. Under *Miles*, if a police officer standing in Sedwick's shoes would have been justified in entering and searching appellant's apartment as Sedwick did, then Sedwick's discovery of Jennifer's body was not evidence obtained in violation of the law under article 38.23(a).

The Fourth Amendment does not bar police officers from making warrantless entries to assist persons who are seriously injured or threatened with serious injury. The need to protect or

27

preserve life or avoid serious injury is justification for what would otherwise be unlawful. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *see also Laney v. State*, 117 S.W.3d 854, 860-61 (Tex. Crim. App. 2003) (discussing emergency doctrine under *Mincey* and distinguishing it from automobile inventory and community caretaking doctrines). This Court has held that for this emergency doctrine to apply, three factors must be present: (1) the officer's conduct must be divorced from the detection, investigation, or acquisition of evidence; (2) the officer must have an immediate, objectively reasonable belief that the search is necessary in order to protect or preserve life or avoid serious injury; and (3) the scope of the search must be strictly circumscribed by the facts of the emergency. *Wiede v. State*, 157 S.W.3d 87, 102 (Tex. App.—Austin 2005, pet. ref'd). Since *Wiede* was decided, however, the United States Supreme Court has made it clear that, in the context of the emergency doctrine, a police officer's subjective motivation is irrelevant in determining whether the officer's actions violated the Fourth Amendment. *Brigham City v. Stuart*, 547 U.S. 398, 126 S. Ct. 1943, 1948 (2006). The Court rejected the argument that the emergency doctrine cannot be invoked if the officer was primarily motivated by an intent to arrest or seize evidence. *Id*. An officer's action is reasonable under the Fourth Amendment if the circumstances, viewed objectively, justify the action. *Id*. In deciding whether an officer had an objectively reasonable belief that his conduct was necessary to protect or preserve life or avoid serious injury, we must take into account the facts and circumstances known to the officer at the time of the search. *Laney*, 117 S.W.3d at 862.

A prominent commentator has observed that "there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable." 3 Wayne R. LaFave, *Search and Seizure* § 6.6(a) (4th ed. 2004). As an example of the proper application of the emergency doctrine,

28

LaFave cites the opinion in *People v. Mitchell*, 347 N.E.2d 607 (N.Y. 1976). In that case, a hotel maid disappeared shortly after she reported to work at 9:00 a.m. *Id*. at 608. Residents of the hotel began to look for her, and they were soon joined by two police patrolmen. *Id*. The maid's street clothes and her partially eaten lunch were found on the sixth floor of the hotel, but a check of vacant rooms and inquiries to the other residents were unavailing. *Id*. At 1:15 p.m., four hours after the maid had last been seen, a homicide detective arrived at the hotel to assist in the search. *Id*. After a thorough search of the basement, roof, alleyways, and air ducts, a room-by-room search of the hotel was commenced. *Id*. The detective entered the defendant's room with a passkey provided by management and found the maid's dead body in a closet. *Id*. at 608-09.

The New York Court of Appeals held that the search of the defendant's hotel room had been reasonable under the Fourth Amendment because it was triggered by an emergency situation. *Id*. at 609. The court ruled that the police had reasonable grounds to believe that there was an emergency: the maid had not been seen for hours, she had not responded when summoned, it was highly probable that she was somewhere in the hotel, and the circumstances "led to the conclusion that some grave misfortune of an indeterminable nature had befallen [her]." *Id*. at 609-10. The court noted the absence of any obvious signs, such as screams or the odor of a decaying corpse, suggesting that the missing maid might be in the defendant's room. *Id*. at 610. But the court also observed that an exhaustive search of the public areas of the hotel had revealed nothing, raising the possibility that the maid was in one of the private rooms, and that the defendant's room was on the floor where the maid had last been seen and where her partially eaten lunch was found. *Id*. The court concluded that a search of the defendant's room "was imperative in light of these facts." *Id*. at 611.

29

As he stood outside appellant's locked condominium apartment on Thursday night, August 18, Sedwick was confronted by an emergency at least as obvious and as immediate, if not more so, than that which confronted the officer in *Mitchell*. Sedwick knew that:

• On Tuesday, Jennifer called her mother, Sharon Cave, to excitedly report that she had accepted a job with an Austin law firm. That night, Jennifer again spoke to her mother by telephone. Still excited about the new job, Jennifer was doing her laundry and deciding which clothes to wear to her new job on Wednesday.

• On Wednesday morning, Jennifer did not report for work. Calls to her cell phone went unanswered, and she was not at her apartment. Jennifer's roommate discovered that Jennifer's bed had not been slept in on Tuesday night. Jennifer's new employers were so concerned that they called her mother that afternoon. Although Sharon did not suspect that Jennifer's disappearance was drug-related, Sharon did know that Jennifer had used drugs in the past.

• Jennifer's last telephone call was at 1:00 a.m. Wednesday morning. Sharon had been unable to reach Jennifer by telephone since learning of her disappearance on Wednesday afternoon. Jennifer, who spoke to her mother by telephone at least once a day, had not called her mother or answered her mother's calls since their Tuesday night conversation. Sharon had called Austin hospitals and even the morgue in her unsuccessful effort to locate her daughter.

• Sharon had made calls to the persons who Jennifer had last spoken to, but only Michael Rodriguez had any pertinent information. According to Rodriguez, Jennifer and appellant had been together on Sixth Street in downtown Austin on Tuesday night and early Wednesday morning.

• When appellant was contacted by Sharon on Wednesday afternoon, he denied having been with Jennifer. Confronted with Rodriguez's contrary information, appellant admitted having seen Jennifer briefly on Tuesday night, but denied having any knowledge of her whereabouts. Sharon's belief that appellant was lying and knew more than he was saying was confirmed on Thursday, when appellant's father told her that appellant had had a dinner date with Jennifer on Tuesday night.

• On Thursday, Jennifer's car was found parked near appellant's apartment. Appellant's car was also parked at the condominium complex. There was, however, no response to repeated knocks on appellant's door and no sign that the apartment was occupied.

30

Considered together, these facts strongly suggested that Jennifer's disappearance was the result of foul play and pointed to appellant's apartment as the most obvious place to look for her. Granted, there were no signs of foul play at the apartment. There had been no reports of shouts or gunshots coming from the apartment. No foul odor had been detected. But Jennifer had been missing without explanation for almost two days, appellant was her last known companion, her car was parked outside appellant's apartment (as was appellant's), and appellant had lied about having been with Jennifer on Tuesday night. If Jennifer was sick or injured or otherwise physically threatened, each passing moment increased the risk of death or serious injury. We conclude that a police officer standing in Sedwick's shoes would have had an objectively reasonable belief that an emergency situation existed and that entry into appellant's apartment was immediately necessary to protect or preserve Jennifer's life or to avoid serious injury to her. *See Brimage v. State*, 918 S.W.2d 466, 503 (Tex. Crim. App. 1996) (op. on reh'g) (holding that emergency doctrine justified warrantless search to locate complainant or to find evidence that would lead to complainant's discovery at different location).

That one or more Austin police officers subjectively believed that they did not have a legal reason to enter the apartment, and conveyed that belief to Sedwick, is irrelevant. It is not clear from the record whether the officer or officers who made the decision not to forcibly enter appellant's apartment on that Thursday night knew all the pertinent facts and circumstances. In any event, an action is reasonable under the Fourth Amendment as long as the circumstances, viewed objectively, justify the action. *Stuart*, 126 S. Ct. at 1948 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). The question is not whether the Austin police subjectively believed that an emergency existed, but whether a police officer standing in Sedwick's shoes and knowing what

31

Sedwick knew would have been objectively warranted in believing that an emergency existed. We hold that he would have been.

Although this case was tried before the opinion in *Miles* was announced, the trial court properly concluded that Sedwick's entry into appellant's apartment on the night in question was reasonable under the emergency doctrine. Sedwick's search of the apartment after entering did not exceed the scope justified by the emergency, and Jennifer's body was discovered in plain view. *See Mincey*, 437 U.S. at 393 (holding that "police may seize any evidence that is in plain view during the course of their legitimate emergency activities"). Sedwick's discovery of Jennifer's body was not information obtained in violation of the Fourth Amendment. For the same reason, there was no violation of article I, section 9 of the Texas Constitution. *See Brimage*, 918 S.W.2d at 500 (recognizing emergency doctrine under Texas Constitution).

**Necessity**

Appellant also contends that the evidence does not support the trial court's conclusion that Sedwick's conduct was immediately necessary to avoid imminent harm. *See* Tex. Penal Code Ann. § 9.22 (West 2003) (necessity defense). Appellant urges that there is no evidence that Sedwick was confronted by an emergency situation requiring a split-second decision without time to consider the law. *See Stefanoff v. State*, 78 S.W.3d 496, 501 (Tex. App.—Austin 2002, pet. ref'd) (discussing necessity defense).

Because it would have been reasonable for a police officer standing in Sedwick's shoes to have entered appellant's apartment under the emergency situation that was objectively apparent, the officer's entry would have been justified by public duty and would not have constituted

32

a criminal trespass.  *See* Tex. Penal Code Ann. § 9.21 (West 2003) (public duty defense); *see also*

*Rosalez v. State*, 875 S.W.2d 705, 717 (Tex. App.—Dallas 1993, pet. ref'd) (holding that officers'

alleged criminal trespass was justified by public duty).  Under *Miles*, we need not decide if Sedwick,

as a private person, would have been justified by necessity in committing an act that might otherwise

constitute a criminal trespass.

We hold that Sedwick's discovery of Jennifer's body was not information obtained

in violation of the law under article 38.23(a) as interpreted in *Miles*.  This information was properly

used to obtain the warrants to search appellant's apartment and automobile.  Point of error three is

overruled.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant's next contention is that his trial counsel rendered ineffective assistance.

To prevail on this claim, appellant must show that his attorneys made such serious errors that they

were not functioning effectively as counsel and that these errors prejudiced appellant's defense to

such a degree that he was deprived of a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687

(1984); *Hernandez v. State*, 988 S.W.2d 770, 771-72 (Tex. Crim. App. 1999); *Hernandez v. State*,

726 S.W.2d 53, 57 (Tex. Crim. App. 1986); *see also Moore v. State*, 694 S.W.2d 528, 531

(Tex. Crim. App. 1985); *O'Hara v. State*, 837 S.W.2d 139, 143 (Tex. App.—Austin 1992,

pet. ref'd).  To prove prejudice, appellant must show that there is a reasonable probability that the

result of his trial would have been different had counsel not performed deficiently.  *Strickland*,

466 U.S. at 693-94.  We must indulge a strong presumption that counsel's conduct fell within the

wide range of reasonable professional assistance.  *See Jackson v. State*, 877 S.W.2d 768, 771

(Tex. Crim. App. 1994). To overcome this presumption, any allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

Appellant first notes that during the course of the trial, his attorneys stated that they had "no objection" when the State offered some of the evidence seized during the searches they had challenged in their motion to suppress. *See Holmes v. State*, No. PD-1050-07, 2008 Tex. Crim. App. LEXIS 327, at *3 (Tex. Crim. App. Mar. 5, 2008) (by stating "no objection," defendant waives right to complain on appeal that evidence unlawfully obtained); *Boykin v. State*, 504 S.W.2d 855, 857 (Tex. Crim. App. 1974) (same; rule applies even if motion to suppress filed and overruled). Appellant argues that if counsel thereby failed to preserve error in the overruling of his pretrial motion to suppress, this constituted ineffective assistance. However, we have already overruled on the merits appellant's contention that the evidence in question was unlawfully obtained and should have been suppressed. Therefore, the alleged error by counsel did not prejudice the defense at trial or on appeal.

Appellant also complains of his attorneys' failure to object to improper jury argument by the State. He urges that an objection should have been made when, on three different occasions during argument at the guilt stage of trial, a prosecutor told the jury that a specific intent to kill could be inferred from the use of a deadly weapon.[2] He claims that an objection should also have been made to the prosecutor's statement that when appellant "pointed that gun and shot Jennifer Cave,

---

[2] The three statements were: (1) "The law says per se that if you kill someone with a deadly weapon, then specific intent can be inferred." (2) "Like Ms. McFarland said, you can infer specific intent, per se, from the use of a handgun." (3) "None of that is important because intent can be inferred from the use of a deadly weapon."

34

he was acting intentionally. There is nothing more intentional than pointing a gun and shooting it." Appellant argues that under penal code section 22.05, only recklessness is presumed when a person points a firearm at another. Tex. Penal Code Ann. § 22.05(c). Appellant complains that the prosecutors' statements improperly shifted the burden of proof to the defense to show that he did not have an intent to kill. *See Sandstrom v. Montana*, 442 U.S. 510, 524 (1979) (holding that due process is violated by presumption shifting burden of persuasion to defendant).

Appellant's argument fails to acknowledge the distinction between an inference and a presumption. The prosecutors did not argue that appellant's intent to kill was *presumed* as a result of his use of a deadly weapon. Instead, the prosecutors argued that the jury could *infer* an intent to kill from his use of a deadly weapon in a deadly manner. Such an inference is proper, as we noted in our discussion of the sufficiency of the evidence. *See Ross*, 861 S.W.2d at 873; *Godsey*, 719 S.W.2d at 581. Counsel's failure to object to the arguments did not constitute ineffectiveness because the arguments were not objectionable.

Point of error four is overruled.

## COMPETENCE TO STAND TRIAL

Appellant's final point of error is that the trial court, on its own motion, should have conducted an inquiry into his competence to stand trial. A person is incompetent to stand trial if he does not have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, or if he does not have a rational and factual understanding of the proceedings against him. Tex. Code Crim. Proc. Ann. art. 46B.003(a) (West 2006). If evidence suggesting that the defendant may be incompetent to stand trial comes to the attention of the court, the court must raise

35

the competency issue on its own motion and determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial. *Id*. art. 46B.004(b), (c).

The statutes governing competency determinations were revised by the legislature in 2003. *See* Act of April 30, 2003, 78th Leg., ch. 35, § 1, 2003 Tex. Gen. Laws 57. Under prior law, a trial court was required to conduct what was referred to as a "section 2 hearing" or a "competency inquiry" if evidence raising a bona fide doubt regarding the defendant's competence was brought to the court's attention from any source. *See McDaniel v. State*, 98 S.W.3d 704, 710 (Tex. Crim. App. 2003). It is unclear whether that same standard governs the trial court's obligation to conduct an "informal inquiry" under the current statute. *See Rojas v. State*, 228 S.W.3d 770, 773 (Tex. App.—Amarillo 2007, no pet.) (applying bona fide doubt standard); *Lawrence v. State*, 169 S.W.3d 319, 323 (Tex. App.—Fort Worth 2005, pet. ref'd) (acknowledging, but not deciding, that new statutory language might create lower evidentiary threshold). Like the *Lawrence* court, we do not decide this issue because we conclude that even under a broad interpretation of article 46B.004(b), there was no evidence suggesting that appellant was incompetent to stand trial.

Appellant argues that the question of his competence to stand trial was raised by his testimony that he could not remember what happened during the early morning of August 17 when Jennifer Cave was shot in his apartment. Appellant also refers us to the testimony of Dr. Richard Coons, a forensic psychiatrist called by the defense. Coons testified that excessive use of alcohol or depressants can result in blackouts or periods of amnesia. In answer to a hypothetical question, Coons said that a person who drank a quart of vodka and took several Xanax tablets might experience such a blackout: "[I]t is completely in keeping with what I have testified to before, that

36

alcohol and Xanax impair the ability to lay down memory and it will impair that ability for all the time that you are sufficiently intoxicated." Coons apparently did not examine appellant, and he did not testify that appellant's claimed lack of memory was genuine.

Amnesia does not easily fit the statutory definition of incompetence. Does an inability to remember the alleged crime hinder a defendant's present ability to consult with counsel with a reasonable degree of rational understanding, or leave the defendant unable to rationally and factually understand the proceedings against him? In its only extensive discussion of this subject, the court of criminal appeals noted that it had found no reported opinion holding that a criminal defendant's inability to recall the event for which he was on trial constituted a mental incapacity to stand trial. *Jackson v. State*, 548 S.W.2d 685, 691 (Tex. Crim. App. 1977). In *Jackson*, the court followed the approach taken in *Wilson v. United States*, 391 F.2d 460 (D.C. Cir. 1968). *Wilson* held that a defendant's amnesia bars prosecution only if the loss of memory so compromises his ability to present a defense as to deprive him of a fair trial and effective assistance of counsel. *Id*. at 462-63. The factors to consider are: (1) the extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer; (2) the extent to which the amnesia affected the defendant's ability to testify in his own behalf; (3) the extent to which the facts of the crime could be reconstructed by extrinsic evidence; (4) the extent to which the government assisted the defense in that reconstruction; (5) the strength of the government's case; and (6) any other facts or circumstances indicating whether or not the defendant received a fair trial. *Id*. at 463-64; *Jackson*, 548 S.W.2d at 692.

In *Wilson*, the defendant was severely injured in an automobile accident while fleeing from the police. 391 F.2d at 461-62. He suffered brain damage, remained unconscious for three weeks, and at the time of his trial had no memory of the afternoon in question. *Id*. The fact of his amnesia was undisputed, and he had previously been determined to be incompetent to stand trial. *Id*. The appeals court remanded the cause to the trial court for a determination as to whether the defendant's amnesia had deprived him of a fair trial. *Id*. at 464.

In *Jackson*, the evidence showed that the defendant, during an argument with his wife, produced a pistol and fired two shots, wounding his wife and killing his sister. 548 S.W.2d at 688. At a pretrial competency hearing, a court-appointed psychiatrist testified that the defendant could not remember the shooting, a fact that the psychiatrist had confirmed by a polygraph examination. *Id*. at 690. The psychiatrist expressed the opinion that the defendant was incompetent to stand trial. *Id*. The defendant's court-appointed attorney testified at the hearing that the defendant "was constantly changing the facts of his story." *Id*. The court of criminal appeals, applying the *Wilson* factors, concluded that the defendant's lack of memory did not adversely affect his ability to reconstruct the event or present a defense, and that the defendant's trial was not unfair under the circumstances. *Id*. at 692.

This issue was raised more recently in *Reed v. State*, 14 S.W.3d 438 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). The opinion cited twenty-one facts and circumstances that the appellate court believed raised a bona fide doubt as to the defendant's competence to stand trial, among them the defendant's inability to remember the event for which he was on trial, his history of mental illness, his organic brain damage, his belief that his attorney was conspiring against him, and the State's pretrial motion for a competency examination. *Id*. at 439-41.

38

Because the competency issue was not raised until sentencing, the court remanded the cause for resentencing. *Id*. at 443.[3]

In the instant cause, there was independent evidence that appellant had a history of alcohol and drug abuse and that he was intoxicated on the night Jennifer Cave was killed. But there was no evidence corroborating appellant's claim that he could not remember the shooting. Appellant's own expert did not examine him, did not confirm the alleged amnesia, and did not express the opinion that appellant was incompetent to stand trial. Throughout the trial, counsel for the State expressed the opinion that appellant's lack of memory was feigned.

There is no evidence suggesting that Jennifer was not killed in appellant's apartment or that any person other than appellant fired the fatal shot. That appellant and Jennifer were on friendly terms was undisputed. The defense was able to show through its firearms expert that the pistol that fired the fatal shot did not have a safety or an indicator to show that it was loaded. Appellant articulately testified on his own behalf and his ability to present his defense—that he would not have intentionally killed his friend—does not appear to have been compromised by his inability to remember the shooting.

Appellant cites defense counsel's statement, "I am not suggesting for a moment that I have got a handle on all of this. The single greatest problem that I have in being in charge of this lawsuit is that I have got a client who cannot tell me what happened." This comment was made during jury argument. Counsel was not asserting to the court that appellant's lack of memory

---

[3] On remand, the trial court determined that the defendant was competent to stand trial and again imposed sentence. The court of appeals affirmed. *Reed v. State*, 112 S.W.3d 706 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

rendered him incompetent to assist in his defense. In fact, during a pretrial hearing, one of appellant's attorneys stated that the defense was not raising any claim of insanity or incompetence.

There is no evidence suggesting that appellant might have been incompetent to stand trial. Having considered the record in light of the factors identified in *Wilson* and *Jackson*, we conclude that appellant's claimed inability to remember the shooting for which he was on trial did not result in a trial that was fundamentally unfair. Point of error five is overruled.

The judgment of conviction is affirmed.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: March 27, 2008

Publish