TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00665-CR






Laura Hall, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT

NO. D-1-DC-07-900170, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 In 2007, a jury convicted appellant Laura Hall of offenses that included tampering
with physical evidence--namely, mutilating the body of a homicide victim. See Tex. Penal Code
Ann. § 37.09 (West 2011). For the evidence-tampering offense, the jury imposed a five-year
sentence. Hall v. State, 283 S.W.3d 137, 142 (Tex. App.--Austin 2009, pet. ref'd). Hall appealed,
and this Court affirmed the judgments of conviction. See id. at 179. However, based on Brady
violations (1) that we concluded had unconstitutionally impacted Hall's punishment hearing, we
reversed and remanded for a new trial on punishment only. See id. On remand, a different jury,
hearing some evidence not presented during Hall's first trial (including additional accounts of self-incriminating and rather disturbing statements made by Hall regarding her offenses and the victim (2)),
imposed a ten-year sentence, plus a fine of $10,000. Hall again appeals. In six issues, Hall asserts
that she was denied counsel during the 30-day period for filing a motion for new trial, that she was
denied the effective assistance of counsel during that same period, and that the district court abused
its discretion when it failed to grant Hall a new trial on the basis of alleged Brady violations. We
will affirm the judgment.


BACKGROUND

 To address the issues Hall raises in her present appeal, we need not comprehensively
recount the macabre facts underlying her convictions, which we have explored at length in our
opinions addressing Hall's first appeal and that of her cohort, Colton Pitonyak. (3) Briefly, as all
concerned are well aware by now, Pitonyak was convicted of murdering Jennifer Cave (4) while
Hall was convicted of the misdemeanor offense of hindering apprehension (aiding Pitonyak in
fleeing to Mexico following the murder) and the felony offense of evidence-tampering (mutilating
Cave's body). Hall received five years' imprisonment for the tampering offense and one year's
imprisonment for the hindering offense. As noted above, this Court affirmed both convictions
but reversed and remanded for a new trial on punishment. See id. During the punishment trial on
remand, the jury considered voluminous testimony and numerous exhibits from twenty-six witnesses
for the State and four witnesses for Hall. A summary of the evidence pertinent to Hall's current
appellate issues follows.

 One of the State's theories during trial was that on the night of the offense, Hall
had been in the condominium where Cave was murdered. To support this theory, the State offered
the testimony of Cassie Carradine, the DNA supervisor for the Austin Police Department's DNA
laboratory. Carradine testified that although Hall could be excluded as a contributor of DNA that
was found on many of the items that had been recovered from the crime scene, including a hacksaw
that had been used to dismember Cave's body, Hall could not be excluded as a contributor of DNA
that was found on other items, including a blue shop towel and one of the flip-flop shoes that had
been found near the bathroom where Cave's body was discovered. Carradine also testified that Hall
could not be excluded as a contributor of DNA that had been found on pistol grips found in
Pitonyak's vehicle and that DNA samples from red sweat pants and brown underwear found in
Pitonyak's vehicle were consistent with Hall's DNA profile.

 In her defense, Hall called her own DNA forensic expert, William Watson. Watson
testified that he had reviewed the State's DNA tests and essentially agreed with the State's findings
that Hall could not be excluded as a contributor of DNA that had been found on certain items.
Watson claimed, however, that although the DNA "could" belong to Hall, "there is insufficient
information here to definitively say one way or the other." Watson also offered alternative
explanations for the presence of Hall's DNA on the items other than her involvement in the crime.

 Following its deliberations, the jury returned a verdict of ten years' imprisonment and
a fine of $10,000 for the tampering offense and one year's imprisonment and a fine of $4,000 for the
misdemeanor hindering offense. (5) The district court sentenced Hall in accordance with the jury's
verdict. On July 23, 2010, trial counsel timely filed a motion for new trial alleging, among other
things, that the State had withheld material evidence favorable to the accused relating to the State's
DNA evidence. See Brady v. Maryland, 373 U.S. 83 (1963). On that same date, trial counsel filed
a motion to withdraw. (6)

 The motion for new trial was later overruled by operation of law. Subsequently, on
September 21, 2010, the district court signed an order permitting trial counsel's withdrawal and a
separate order appointing appellate counsel. This appeal followed.


ANALYSIS

Denial of counsel

 In her first and second issues, Hall asserts that she was denied counsel during the time
that she was required to present her motion for new trial and that this denial violated her right to
counsel under the federal and state constitutions and the Texas Fair Defense Act. See U.S. Const.
amend. VI; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.051 (West Supp. 2010). (7) In
response, the State argues that the record does not reflect that Hall was deprived of counsel during
the period at issue.

 "[A]ppointment of counsel for an indigent is required at every stage of a criminal
proceeding where substantial rights of a criminal accused may be affected." Mempa v. Rhay,
389 U.S. 128, 135 (1967); Cooks v. State, 240 S.W.3d 906, 910 (Tex. Crim. App. 2007). This
includes the first appeal as of right. See Douglas v. California, 372 U.S. 353, 357 (1963). To ensure
that a defendant's appellate rights are protected, the thirty days after a defendant's sentence has been
imposed and during which a motion for new trial can be filed is also considered a critical stage. See
Cooks, 240 S.W.3d at 911; see also Massingill v. State, 8 S.W.3d 733, 736-37 (Tex. App.--Austin
1999, pet. ref'd) (explaining that in order to obtain meaningful appeal, sometimes defendant must
prepare, file, present, and obtain hearing on motion for new trial and that it is unreasonable to require
him to do so without assistance of counsel).

 To prevail on a claim of deprivation of counsel during the time to prepare, file,
and present a motion for new trial, Hall must affirmatively prove that she was not represented
by counsel during this critical stage of the proceedings. Nguyen v. State, 222 S.W.3d 537, 540
(Tex. App.--Houston [14th Dist.] 2007, pet. ref'd); Garcia v. State, 97 S.W.3d 343, 347
(Tex. App.--Austin 2003, no pet.). In cases where a defendant is represented by counsel during
trial, a rebuttable presumption exists that trial counsel continued to adequately represent the
defendant during this critical stage. Cooks, 240 S.W.3d at 911 (citing Oldham v. State, 977 S.W.2d
354, 360-63 (Tex. Crim. App. 1998)). This presumption arises, in part, because appointed counsel
remains as the accused's counsel for all purposes until expressly permitted to withdraw, even if the
original appointment was for trial only. Garcia, 97 S.W.3d at 347 (citing Ward v. State, 740 S.W.2d
794, 796 (Tex. Crim. App. 1987)). The presumption is not rebutted when there is nothing in the
record to suggest that appellant was not represented by counsel during the period in question. See
id. (citing Smith v. State, 17 S.W.3d 660, 662-63 (Tex. Crim. App. 2000)).

 The record in this case reflects that trial counsel was appointed on June 17, 2010. (8)
The order appointing counsel expressly states that counsel "is hereby appointed to represent the
defendant in this cause until the case is concluded, including appeals, if any, or until released by
order of the Court." Although trial counsel moved to withdraw when he filed his motion for
new trial, there is no indication in the record that the district court granted his request at that time.
To the contrary, the record reflects that counsel was not allowed to withdraw until September 21,
2010, which was after the motion for new trial had been overruled by operation of law. On that same
date, appellate counsel was appointed. There is no evidence that counsel withdrew prior to that date.
On this record, we conclude that Hall has failed to rebut the presumption that she was represented
by counsel during the period for filing a motion for new trial.

 We overrule Hall's first and second issues.


Motion for new trial

 We next address Hall's fourth and fifth issues, as our disposition of these issues
informs the analysis of Hall's two other remaining issues. In her fourth and fifth issues, Hall
argues that she was denied due process when the district court allowed her motion for new trial to
be overruled by operation of law and that the district court abused its discretion in failing
to grant the motion on the basis of her alleged Brady violations. In response, the State argues
primarily that there was no Brady violation and thus the district court did not abuse its discretion in
overruling the motion.

 The motion for new trial contained numerous allegations against the State, most of
which have not been carried forward on appeal. In her appellate brief, Hall states that the motion
for new trial "concerned itself, in the main, with allegations that came to light, days before Hall's
trial, that the Austin Police Department's Forensics lab . . . had been accused of doing substandard,
shoddy, and incomplete DNA analysis with lax training and quality controls." Hall asserted the
following material factual allegations in her motion for new trial.

 Prior to jury selection on June 28, 2010, according to Hall's motion, the prosecutors
approached defense counsel and provided them with "a short document outlining what they alleged
were personnel issues by a disgruntled employee of the Austin Police Department Forensic Science
Division. The document was a short synopsis of a complaint filed by DNA analyst Cecily Hamilton
against the DNA Laboratory Director, Cassie Carradine. They explained that Ms. Hamilton had
resigned in May . . . [and they] assured [defense counsel] it did not reflect on the quality of the work
performed at the Austin Police Department Forensic Science Division."

 On July 7, several days after the trial had concluded, defense counsel received a
"form email" from one of the prosecutors addressed to other prosecutors and members of the
criminal defense bar. The email, which was entitled, "APD DNA Complaints and Investigation--
IMPORTANT," informed the recipients that "[t]he Travis County District Attorney's Office has
recently been made aware of a complaint filed by former APD DNA analyst Cecily Hamilton" and
that the "complaint was investigated internally by the Austin Police Department." Attached to the
email were several documents including an "Initial written concern by Hamilton dated February 11,
2010," and an "Investigative Results Memo dated March 22, 2010." According to counsel, it was
only after receiving this email that he "learned that this investigation had begun in February of 2010
and had ended with a Memo dated March 22, 2010."

 Hall's counsel went on to allege that this investigation had been documented in a
front-page article in the Austin American-Statesman on July 8. The article indicated that "thousands
of cases could be affected," that the District Attorney had been notified of the investigation on
June 23, and that "last week" she had instructed her prosecutors to "notify defense attorneys involved
in any cases with DNA evidence." Counsel claimed that "the 'last week' [the District Attorney] is
speaking of in the newspaper was the week of [Hall]'s re-trial."

 Counsel went on to allege that the documents attached to the email he had received
were not the "short synopsis of personnel problems" that prosecutors had disclosed to counsel prior
to trial. Instead, counsel claimed, the documents contained allegations "regarding testing and quality
assurance" and "management of the lab." Counsel included in his motion a summary of Hamilton's
complaint against Carradine, which included allegations that Carradine had allowed a lab analyst
with "very significant issues and problems" to perform independent DNA analysis and that Carradine
had "misconstrued and misrepresented the facts about the quality assurance problems in the DNA
unit to upper management."

 Counsel concluded that, "[r]egardless of the truth of the matters asserted in these
documents, it is clear that this was Brady material and any Assistant or Elected District Attorney
had an immediate duty to bring the information to the attention of the Defense by providing
all the documents in their possession." Hall makes the same argument on appeal: "Whether those
allegations were true or not is beside the point. Substantive allegations had been made, and the
allegations were known by the state's counsel to have been made, and the state was obligated to
inform Ms. Hall of the allegations, if for no other reason than for impeachment purposes." (9)

 Because the alleged Brady violations were raised in the context of a motion for
new trial, we review the trial court's ruling under an abuse-of-discretion standard. See Webb v. State,
232 S.W.3d 109, 112 (Tex. Crim. App. 2007); Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim.
App. 2004); Pittman v. State, 321 S.W.3d 565, 570 (Tex. App.--Houston [14th Dist.] 2010, no pet.);
Hall, 283 S.W.3d at 165 (citing Holden v. State, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006)).
Under this standard, an appellate court should uphold a trial judge's ruling unless it is outside the
"zone of reasonable disagreement." Hall, 283 S.W.3d at 165 (citing Oprean v. State, 201 S.W.3d
724, 726 (Tex. Crim. App. 2006)). In other words, we do not substitute our judgment for that of the
trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. 
Charles, 146 S.W.3d at 208. We must view the evidence in the light most favorable to the trial
court's ruling and presume that all reasonable factual findings that could have been made against
the losing party were made against that losing party. Id. Thus, a trial court abuses its discretion in
denying a motion for new trial only when no reasonable view of the record could support the
trial court's ruling. Id.

 Before addressing the merits of the motion for new trial, the State raises a procedural
point concerning the motion. The State argues that Hall failed to present her motion for new trial
to the district court. A motion for new trial must be "presented" to the trial court within ten days of
being filed. Gardner v. State, 306 S.W.3d 274, 305 (Tex. Crim. App. 2009) (citing Tex. R. App.
P. 21.6). The term "present," as used in this context, "means the record must show the movant for
a new trial sustained the burden of actually delivering the motion for new trial to the trial court or
otherwise bringing the motion to the attention or actual notice of the trial court." Carranza v. State,
960 S.W.2d 76, 79 (Tex. Crim. App. 1998). "This may be accomplished in several ways such as,
for example, obtaining the trial court's ruling on a motion for new trial." Id. "[T]he presentment
'must be directed to the trial court or another authorized to act on behalf of the trial court,' and it
'may be evidenced by the judge's signature or notation on a proposed order or by a hearing date
set on the docket. This list is not meant to be exhaustive, but merely suggestive as to how one
may fulfill the communication requirement for presenting a motion for new trial.'" Stokes v. State,
277 S.W.3d 20, 22 (Tex. Crim. App. 2009) (quoting Carranza, 960 S.W.2d at 79). "The rationale
for this requirement is the same as that which supports preservation of error generally: A trial court
should not be reversed on a matter that was not brought to the trial court's attention." Rozell v. State,
176 S.W.3d 228, 230 (Tex. Crim. App. 2005). "Presenting the motion, along with a request for a
hearing, is required to let the court know that the defendant wants the trial court to act on the motion
and whether the defendant would like a hearing on the motion." Id.

 In this case, there is no entry on the district court's docket sheet regarding the
motion for new trial, no hearing on the motion was set or held, there is no signature or other notation
by the judge on the motion, the proposed order attached to the motion setting the matter for hearing
is completely blank, there is no order in the record denying the motion for new trial, and there is no
indication in the record that the court had actual knowledge that the motion for new trial was filed. (10)
There is a "register of actions" in the record that includes an entry reflecting the date the motion for
new trial was filed, but this appears to be nothing more than the district clerk's computer-generated
record of documents that were filed in the district clerk's office and the calendar settings in the case.
There is no entry on the clerk's registry showing any presentment to or action by the district court
regarding the motion for new trial. The record, in short, does not reflect that the motion for new trial
was ever "presented" to the district court. Hall ultimately acknowledges as much in her brief,
observing, "[I]t is not clear from the record whether the motion for new trial was ever presented to
the district court." (11)

 Moreover, even if the motion for new trial had been presented, we could not
conclude on this record that the district court abused its discretion in not granting the motion. In our
prior opinion addressing Hall's previous Brady complaints, we explained the requirements that
Brady imposes on the State:


A defendant in a criminal case has no general right to pretrial discovery of evidence
in the State's possession. However, under Brady and its progeny, the United States
Supreme Court has recognized "what amounts to a federal constitutional right
to certain minimal discovery." These authorities hold that "[t]o protect a criminal
defendant's right to a fair trial, the Due Process Clause of the Fourteenth Amendment
to the United States Constitution requires the prosecution to disclose exculpatory and
impeachment evidence to the defense that is material to either guilt or punishment,"
and that the State's failure to comply with this duty constitutes harm requiring
reversal and a new trial. 



Hall, 283 S.W.3d at 163 (internal citations omitted). The failure to comply with this duty violates
due process "irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87.

However, to find reversible error under Brady, a defendant must show three things: (1) the State
failed to disclose evidence in its possession; (2) the withheld evidence is favorable to the defendant;
and (3) the evidence is "material." Hampton v. State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).
The evidence may be material to either guilt or punishment. Brady, 373 U.S. at 87.

 The district court would not have abused its discretion in finding that the evidence
at issue was not material. As we explained in our prior opinion, undisclosed evidence is "material"
to guilt or punishment "only if there is a reasonable probability that, had the evidence been
disclosed to the defense, the result of the proceeding would have been different." Hall, 283 S.W.3d
at 171 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). A "reasonable probability" is "a
probability sufficient to undermine confidence in the outcome." Id. In other words, "[t]he question
is not whether the defendant would more likely than not have received a different verdict with
the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a
verdict worthy of confidence." Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). Although
the standard "is not a sufficiency of the evidence test," the defendant must "show[] that the favorable
evidence could reasonably be taken to put the whole case in such a different light as to undermine
confidence in the verdict." Id. (quoting Kyles, 541 U.S. at 434-35). "The mere possibility that an
item of undisclosed information might have helped the defense, or might have affected the outcome
of the trial, does not establish 'materiality' in the constitutional sense." Hampton, 86 S.W.3d at 612
(quoting United States v. Agurs, 427 U.S. 97, 109 (1976)). "Usually, a determination concerning
the materiality prong of Brady involves balancing the strength of the [favorable] evidence against
the evidence supporting [the verdict]." Id. at 613. We must accordingly consider "the entire body
of evidence" at trial. Id.

 In this case, the favorable evidence had a tendency to undermine the State's
DNA evidence and the credibility of the State's DNA expert, Cassie Carradine. However, on this
record, we cannot conclude that there is a reasonable probability that, had such evidence been
disclosed, the result of the proceeding would have been different. First, the allegations by Hamilton
against Carradine related to a particular analyst under Carradine's supervision, Diana Morales. But
there is no indication in the record that Morales participated in the DNA testing in Hall's case.
Rather, Carradine testified that analyst Maurice Padilla "did the DNA testing" while Carradine
herself "did all the technical review." Carradine testified that this meant that she "went back to
all the raw data that was generated and made all [her] own interpretations . . . and verified that
my results were consistent with his results." Hamilton's allegations, as far as the record reveals,
implicated Carradine's supervisory and management skills, not her abilities as an analyst. Also,
there is no indication in the record as to the time frame of the allegations against Carradine and
whether those allegations occurred during the time period in which Hall's DNA was tested.
Additionally, Hall's own DNA expert, William Watson, testified that he had independently reviewed
the DNA test results himself and that he agreed with the findings regarding the presence of Hall's
DNA on certain items and the absence of her DNA on other items. When asked if had found any
problems with the testing procedures, Watson testified, "Nothing that stood out as a major issue, no.
I can't even really think of any minor issues specifically related to the testing itself, the generation
of data from the samples that were tested by the laboratory." Watson added on cross-examination
that Carradine "has a very good reputation as a professional" and that he, as an auditor with the
agency that accredits Carradine's lab, does not have any issues with the quality of the work
performed there.

 Also, according to the DNA evidence presented, Hall was positively excluded as a
contributor to most of the items recovered at the crime scene, and defense counsel effectively
emphasized this during his cross-examination of Carradine and his direct examination of Watson.
Thus, the disclosure of the favorable evidence, although it might have undermined the State's theory
that DNA evidence proved Hall was present in the condominium on the night in question, could
have also undermined the defense theory that the DNA evidence exonerated her. (12) For this reason,
defense counsel might not have wanted to present the evidence even if it had been disclosed to him.
Thus, the district court could have found for this reason also that there was not a reasonable
probability that, had the evidence been disclosed, the result of the proceeding would have
been different.

 Moreover, this was not a case that turned on DNA evidence. As the State emphasized
during its closing argument, there was considerable evidence in the State's case against Hall that was
completely independent of the DNA evidence. The evidence included the testimony of:


Nora Sullivan, a friend of Pitonyak's, who testified that Hall had told her that she had
been with Pitonyak after Cave was killed and that Hall was "trying to motivate him
or urge him . . . to complete their intention" to "dismember" Cave's body.


Ryan Martindill and Star Salzman, friends of Hall's, who testified that Hall had told
them that she had gone with Pitonyak to Mexico and that they were "on vacation."


Joseph Smith, a Deputy United States Marshall with the Lone Star Fugitive Task
Force, who testified that he found video footage of Pitonyak and Hall crossing
the border together into Mexico the night following the murder, that in the video,
"Laura Hall was clearly driving," and that Hall was found in Mexico with Pitonyak.


Detective Mark Gilchrest of the Austin Police Department, who testified that
Pitonyak's cell phone showed a call sent to and a text message received from Hall's
cell phone on the morning following the murder and that Hall's Facebook page had
a favorite quotation that read, "You're part music and part blood, part thinker and
part killer, and if you can find that--all of that within you and control it, then you
deserve to be set apart" and "I should really be more of a horrific person. It's in the
works."


Said Aziz, a friend of Hall's, who testified that Hall had called him after she had been
apprehended in Mexico and told him, "I have been all up in this shit since about like
two hours after shit started"; that she wanted to help Pitonyak so that "he might
walk"; and that, when he asked her why she wanted to help Pitonyak, she answered
"that she loved him" and "that's how she rolled."


Javier Rosales, a co-worker of Hall's, who testified that Hall had told him that she
was the "mastermind" of the plan for her and Pitonyak to "escape" to Mexico.


Katy Grayson, a convicted felon who had met Hall while they were in jail together,
who testified that Hall had told her that "the eeriest part" of cutting up a body "was
cutting through bone."


Christy Freeman, a convicted felon who had met Hall in jail, who testified that Hall
had stated in a group therapy session that "the whore was just a dancer. She deserved
to die."


Henriette Langenbach, another convicted felon who had met Hall in jail, who
testified that Hall had told her that it was her idea to dispose of the body because
Pitonyak "just couldn't think straight" and that Hall had suggested they "cut up the
body by removing the hands, the feet and the head" because "those three things
would be the way to identify a body."


Various other witnesses who testified to Hall's demeanor and statements that she had
made while in jail.


Elizabeth Peacock, a medical examiner who performed the autopsy on Cave's body,
who testified that Cave's body was subject to several post-mortem wounds, including
stab wounds to the face, neck, and chest; severed hands and head, and a gunshot
wound through her neck into her head.


The stepfather and mother of the victim, who provided testimony about how much
they loved their daughter, how much they feared and felt threatened by Hall when she
was out on bail, and how they felt safer when she was incarcerated. 



The evidence also included numerous exhibits, including cell phone records showing that Hall and
Pitonyak had communicated with each other following the murder, transcripts of jailhouse phone
conversations between Hall and her friends and family, and an episode of the television program
48 Hours, in which Hall was interviewed extensively and made statements that supported the State's
theory of the case.

 We conclude that the record in this case supports a finding by the district court that
there is not a reasonable probability that, had the evidence concerning the issues at the forensics lab
been disclosed, the result of the proceeding would have been different. Accordingly, even assuming
the motion for new trial had been presented to the district court, we could not conclude that the
district court abused its discretion in overruling the motion.

 We overrule Hall's fourth and fifth issues. 


Effective assistance of counsel

 In her third issue, Hall claims that she was denied effective assistance of counsel
"when her trial counsel wrongfully believed he had been relieved of his duty to represent Hall." In
her sixth issue, Hall similarly asserts that trial counsel, believing he had become a fact witness in the
motion for new trial, failed to present his motion for new trial to the district court. "The failure of
such presentment," Hall claims, "denied [her] effective assistance of counsel."

 Hall's arguments implicate Strickland v. Washington, 466 U.S. 668 (1984). To
prevail on a Strickland claim, Hall must prove by a preponderance of the evidence that counsel was
ineffective. Perez v. State, 310 S.W.3d 890, 892 (Tex. Crim. App. 2010) (citing Strickland, 466 U.S.
668). There are two required components of an ineffectiveness claim: performance and prejudice.
Id. First, Hall must prove that counsel's performance was deficient. Strickland, 466 U.S. at 687;
Perez, 310 S.W.3d at 892. To satisfy this prong of the analysis, Hall "must show that counsel's
representation fell below an objective standard of reasonableness" based upon "prevailing
professional norms." Strickland, 466 U.S. at 688; Perez, 310 S.W.3d at 893. For this performance
inquiry we consider all of the circumstances, with "a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89; Perez,
310 S.W.3d at 893.

 "Second, the defendant must show that the deficient performance prejudiced
the defense. This requires showing that counsel's errors were so serious as to deprive the defendant
of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. To succeed under the
prejudice component, Hall "must show that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.
"It is not enough for the defendant to show that the errors had some conceivable effect on
the outcome of the proceeding." Id. at 693. Rather, she must show that "there is a reasonable
probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."
Id. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider
the totality of the evidence before the judge or jury." Id. "[A] verdict or conclusion only weakly
supported by the record is more likely to have been affected by errors than one with overwhelming
record support." Id. at 696.

 There is nothing in the record to support Hall's theory that trial counsel "wrongfully
believed he had been relieved of his duty to represent Hall." The record does not indicate what
counsel believed or, for that matter, what counsel did after filing the motion for new trial and
motion to withdraw. There are no affidavits from Hall, counsel, or anyone else shedding light on
the matter. Although counsel, in his motion for new trial, asked to be allowed to withdraw because
he had become a fact witness, there is no indication in the record that following those filings, he
ceased in his representation of Hall. Absent evidence to the contrary, we must presume counsel
continued in his representation until the district court allowed him to withdraw. See Cooks,
240 S.W.3d at 911. 

 As for the fact that counsel did not present the motion for new trial to the
district court, the record is silent as to the reasons for counsel's decision. When the record is silent
regarding the reasons for counsel's decisions, we will not find deficient performance unless the
challenged conduct was "so outrageous that no competent attorney would have engaged in it."
Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). We cannot say on this record
that no competent attorney would have decided not to present the motion for new trial. Counsel
could have decided, for the reasons discussed above or for other reasons, that he did not have
sufficient evidence to support his motion or that the motion for new trial had little to no chance of
success. There is also the possibility that counsel filed the motion for new trial simply to extend the
appellate deadline or that, after filing the motion, counsel spoke with his client about the motion
and was told by her that, for whatever reason, she did not wish to pursue the motion further. See
Oldham, 977 S.W.2d at 363; see also Venzor v. State, No. 04-05-00808-CR, 2006 Tex. App. LEXIS
6149, at *4-5 (Tex. App.--San Antonio July 19, 2006, no pet.) (mem. op., not designated for
publication) (declining to find ineffective assistance when record did not contain specific explanation
for counsel's decision to not present motion for new trial and observing that "a motion for new trial
is often filed exclusively to extend the appellate time limits"). On this record, we can do nothing but
speculate as to the reasons for counsel's conduct. Such speculation does not satisfy the requirements
of Strickland. See Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

 We also cannot conclude on this record that Hall proved that she was prejudiced
by counsel's decision not to present the motion for new trial. For the reasons discussed above,
the record fails to show a reasonable probability that, but for counsel not presenting the motion for
new trial to the district court, the result of the proceeding would have been different. See Strickland,
466 U.S. at 693-96.

 We overrule Hall's third and sixth issues.


CONCLUSION

 We affirm the judgment of the district court.



 __________________________________________

 Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed: August 24, 2011

Do Not Publish
1. See Brady v. Maryland, 373 U.S. 83 (1963).
2. See Hall v. State, 283 S.W.3d 137, 149-52 (Tex. App.--Austin 2009, pet. ref'd)
(recounting Hall's purported statements to four different witnesses). 
3. See Pitonyak v. State, 253 S.W.3d 834 (Tex. App.--Austin 2008, pet. ref'd).
4. Which this Court affirmed on appeal. See id.
5. No notice of appeal for the hindering offense was filed, and the judgment of conviction for
that offense has not been included in the clerk's record. However, the verdict of the jury was read
in open court and thus can be found in the reporter's record.
6. The basis for counsel's request to withdraw is unclear from the record. In the prayer of
his motion for new trial, trial counsel asks that he be allowed to withdraw because "he has become
a fact witness" relating to matters alleged in the motion for new trial. However, in his motion to
withdraw, counsel simply states that he has "completed the trial to which he was appointed."
7. Hall does not argue that either the Texas Constitution or the Texas Fair Defense Act
provides greater or different protection than the Sixth Amendment to the United States Constitution.
Accordingly, we address these claims together. See Muniz v. State, 851 S.W.2d 238, 251-52
(Tex. Crim. App. 1993). 
8. Trial counsel specifically requested that he be appointed on retrial because he had
represented Hall during her first trial.
9. There is no dispute that the State knew of the allegations made by Hamilton against
Carradine. In fact, in its motion in limine filed on the day of trial, the State requested that the
defense be prohibited from making "[a]ny reference to an allegation against Cassie Carradine by
Cecily Hamilton."
10. We also observe that there is an entry on the district court's docket sheet reflecting that
a motion for new trial was filed following Hall's first trial. Thus, the absence of a notation on the
docket sheet reflecting the filing of the current motion for new trial is particularly probative of the
district court's lack of awareness of the current motion.
11. In fact, this lack of presentment forms the basis of Hall's ineffective-assistance-of-counsel
complaint, discussed below.
12. In fact, it was defense counsel that emphasized the DNA evidence in its closing argument,
while the State discounted it. Defense counsel argued,


We turn to those things that have no emotion, and in this case it's science because
science we can trust. And in this case it's DNA, and the DNA proves what [Hall]
has been proclaiming this entire time. Both experts agree that the testing and the
procedures performed in this case were performed correctly. . . . And the DNA
shows that on a blue towel and a shoe, only 4 loci out of 13 were consistent with
[Hall] and as many as 25 percent of the Caucasian population chosen at random. . . .
And of all the DNA that is found, more importantly where she is not found: the
machete, the hacksaw, and the buck knife. And out of all of those items where
Ms. Cave's blood is found, where Colton Pitonyak's blood is found and where a
mixture of other blood is found, 18 items in total, Ms. Hall is not only not found;
she is excluded. No, DNA tells us who did this. Colton Pitonyak. And how do we
know? Because his DNA is in all of those items.


In contrast, the State argued,


We spent an hour listening to their DNA expert . . . tell you that he agrees with the
State's DNA expert. . . . But this evidence in this case is not . . . DNA is a piece of
it, but it's not all of it. And you heard an hour going on and on and on about how no
one can say that she touched the gun, and DNA doesn't prove she touched the gun. 
We don't need DNA to prove she touched the gun. Their client told 48 Hours she
touched the gun. . . . So science does not give us the answer to what happened. It's
a piece of it, but it's not the whole thing. If you only focus on the DNA, you are
going to get sidetracked.