# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-10-00665-CR

Laura Hall, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
NO. D-1-DC-07-900170, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In 2007, a jury convicted appellant Laura Hall of offenses that included tampering with physical evidence—namely, mutilating the body of a homicide victim. *See* Tex. Penal Code Ann. § 37.09 (West 2011). For the evidence-tampering offense, the jury imposed a five-year sentence. *Hall v. State*, 283 S.W.3d 137, 142 (Tex. App.—Austin 2009, pet. ref'd). Hall appealed, and this Court affirmed the judgments of conviction. *See id*. at 179. However, based on *Brady* violations[1] that we concluded had unconstitutionally impacted Hall's punishment hearing, we reversed and remanded for a new trial on punishment only. *See id.* On remand, a different jury, hearing some evidence not presented during Hall's first trial (including additional accounts of self-incriminating and rather disturbing statements made by Hall regarding her offenses and the victim[2]),

---

[1] *See Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *See Hall v. State*, 283 S.W.3d 137, 149-52 (Tex. App.—Austin 2009, pet. ref'd) (recounting Hall's purported statements to four different witnesses).

imposed a ten-year sentence, plus a fine of $10,000. Hall again appeals. In six issues, Hall asserts that she was denied counsel during the 30-day period for filing a motion for new trial, that she was denied the effective assistance of counsel during that same period, and that the district court abused its discretion when it failed to grant Hall a new trial on the basis of alleged *Brady* violations. We will affirm the judgment.

## BACKGROUND

To address the issues Hall raises in her present appeal, we need not comprehensively recount the macabre facts underlying her convictions, which we have explored at length in our opinions addressing Hall's first appeal and that of her cohort, Colton Pitonyak.[3] Briefly, as all concerned are well aware by now, Pitonyak was convicted of murdering Jennifer Cave[4] while Hall was convicted of the misdemeanor offense of hindering apprehension (aiding Pitonyak in fleeing to Mexico following the murder) and the felony offense of evidence-tampering (mutilating Cave's body). Hall received five years' imprisonment for the tampering offense and one year's imprisonment for the hindering offense. As noted above, this Court affirmed both convictions but reversed and remanded for a new trial on punishment. *See id*. During the punishment trial on remand, the jury considered voluminous testimony and numerous exhibits from twenty-six witnesses for the State and four witnesses for Hall. A summary of the evidence pertinent to Hall's current appellate issues follows.

---

[3] *See Pitonyak v. State*, 253 S.W.3d 834 (Tex. App.—Austin 2008, pet. ref'd).

[4] Which this Court affirmed on appeal. *See id.*

2

One of the State's theories during trial was that on the night of the offense, Hall had been in the condominium where Cave was murdered. To support this theory, the State offered the testimony of Cassie Carradine, the DNA supervisor for the Austin Police Department's DNA laboratory. Carradine testified that although Hall could be excluded as a contributor of DNA that was found on many of the items that had been recovered from the crime scene, including a hacksaw that had been used to dismember Cave's body, Hall could not be excluded as a contributor of DNA that was found on other items, including a blue shop towel and one of the flip-flop shoes that had been found near the bathroom where Cave's body was discovered. Carradine also testified that Hall could not be excluded as a contributor of DNA that had been found on pistol grips found in Pitonyak's vehicle and that DNA samples from red sweat pants and brown underwear found in Pitonyak's vehicle were consistent with Hall's DNA profile.

In her defense, Hall called her own DNA forensic expert, William Watson. Watson testified that he had reviewed the State's DNA tests and essentially agreed with the State's findings that Hall could not be excluded as a contributor of DNA that had been found on certain items. Watson claimed, however, that although the DNA "could" belong to Hall, "there is insufficient information here to definitively say one way or the other." Watson also offered alternative explanations for the presence of Hall's DNA on the items other than her involvement in the crime.

Following its deliberations, the jury returned a verdict of ten years' imprisonment and a fine of $10,000 for the tampering offense and one year's imprisonment and a fine of $4,000 for the misdemeanor hindering offense.[5] The district court sentenced Hall in accordance with the jury's

---

[5] No notice of appeal for the hindering offense was filed, and the judgment of conviction for that offense has not been included in the clerk's record. However, the verdict of the jury was read in open court and thus can be found in the reporter's record.

verdict. On July 23, 2010, trial counsel timely filed a motion for new trial alleging, among other things, that the State had withheld material evidence favorable to the accused relating to the State's DNA evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963). On that same date, trial counsel filed a motion to withdraw.[6]

The motion for new trial was later overruled by operation of law. Subsequently, on September 21, 2010, the district court signed an order permitting trial counsel's withdrawal and a separate order appointing appellate counsel. This appeal followed.

## ANALYSIS

**Denial of counsel**

In her first and second issues, Hall asserts that she was denied counsel during the time that she was required to present her motion for new trial and that this denial violated her right to counsel under the federal and state constitutions and the Texas Fair Defense Act. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.051 (West Supp. 2010).[7] In response, the State argues that the record does not reflect that Hall was deprived of counsel during the period at issue.

---

[6] The basis for counsel's request to withdraw is unclear from the record. In the prayer of his motion for new trial, trial counsel asks that he be allowed to withdraw because "he has become a fact witness" relating to matters alleged in the motion for new trial. However, in his motion to withdraw, counsel simply states that he has "completed the trial to which he was appointed."

[7] Hall does not argue that either the Texas Constitution or the Texas Fair Defense Act provides greater or different protection than the Sixth Amendment to the United States Constitution. Accordingly, we address these claims together. *See Muniz v. State*, 851 S.W.2d 238, 251-52 (Tex. Crim. App. 1993).

"[A]ppointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." *Mempa v. Rhay*, 389 U.S. 128, 135 (1967); *Cooks v. State*, 240 S.W.3d 906, 910 (Tex. Crim. App. 2007). This includes the first appeal as of right. *See Douglas v. California*, 372 U.S. 353, 357 (1963). To ensure that a defendant's appellate rights are protected, the thirty days after a defendant's sentence has been imposed and during which a motion for new trial can be filed is also considered a critical stage. *See Cooks*, 240 S.W.3d at 911; *see also Massingill v. State*, 8 S.W.3d 733, 736-37 (Tex. App.—Austin 1999, pet. ref'd) (explaining that in order to obtain meaningful appeal, sometimes defendant must prepare, file, present, and obtain hearing on motion for new trial and that it is unreasonable to require him to do so without assistance of counsel).

To prevail on a claim of deprivation of counsel during the time to prepare, file, and present a motion for new trial, Hall must affirmatively prove that she was not represented by counsel during this critical stage of the proceedings. *Nguyen v. State*, 222 S.W.3d 537, 540 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd); *Garcia v. State*, 97 S.W.3d 343, 347 (Tex. App.—Austin 2003, no pet.). In cases where a defendant is represented by counsel during trial, a rebuttable presumption exists that trial counsel continued to adequately represent the defendant during this critical stage. *Cooks*, 240 S.W.3d at 911 (citing *Oldham v. State*, 977 S.W.2d 354, 360-63 (Tex. Crim. App. 1998)). This presumption arises, in part, because appointed counsel remains as the accused's counsel for all purposes until expressly permitted to withdraw, even if the original appointment was for trial only. *Garcia*, 97 S.W.3d at 347 (citing *Ward v. State*, 740 S.W.2d 794, 796 (Tex. Crim. App. 1987)). The presumption is not rebutted when there is nothing in the

5

record to suggest that appellant was not represented by counsel during the period in question. *See id.* (citing *Smith v. State*, 17 S.W.3d 660, 662-63 (Tex. Crim. App. 2000)).

The record in this case reflects that trial counsel was appointed on June 17, 2010.[8] The order appointing counsel expressly states that counsel "is hereby appointed to represent the defendant in this cause until the case is concluded, including appeals, if any, or until released by order of the Court." Although trial counsel moved to withdraw when he filed his motion for new trial, there is no indication in the record that the district court granted his request at that time. To the contrary, the record reflects that counsel was not allowed to withdraw until September 21, 2010, which was after the motion for new trial had been overruled by operation of law. On that same date, appellate counsel was appointed. There is no evidence that counsel withdrew prior to that date. On this record, we conclude that Hall has failed to rebut the presumption that she was represented by counsel during the period for filing a motion for new trial.

We overrule Hall's first and second issues.

**Motion for new trial**

We next address Hall's fourth and fifth issues, as our disposition of these issues informs the analysis of Hall's two other remaining issues. In her fourth and fifth issues, Hall argues that she was denied due process when the district court allowed her motion for new trial to be overruled by operation of law and that the district court abused its discretion in failing to grant the motion on the basis of her alleged *Brady* violations. In response, the State argues

---

[8] Trial counsel specifically requested that he be appointed on retrial because he had represented Hall during her first trial.

6

primarily that there was no *Brady* violation and thus the district court did not abuse its discretion in overruling the motion.

The motion for new trial contained numerous allegations against the State, most of which have not been carried forward on appeal. In her appellate brief, Hall states that the motion for new trial "concerned itself, in the main, with allegations that came to light, days before Hall's trial, that the Austin Police Department's Forensics lab . . . had been accused of doing substandard, shoddy, and incomplete DNA analysis with lax training and quality controls." Hall asserted the following material factual allegations in her motion for new trial.

Prior to jury selection on June 28, 2010, according to Hall's motion, the prosecutors approached defense counsel and provided them with "a short document outlining what they alleged were personnel issues by a disgruntled employee of the Austin Police Department Forensic Science Division. The document was a short synopsis of a complaint filed by DNA analyst Cecily Hamilton against the DNA Laboratory Director, Cassie Carradine. They explained that Ms. Hamilton had resigned in May . . . [and they] assured [defense counsel] it did not reflect on the quality of the work performed at the Austin Police Department Forensic Science Division."

On July 7, several days after the trial had concluded, defense counsel received a "form email" from one of the prosecutors addressed to other prosecutors and members of the criminal defense bar. The email, which was entitled, "APD DNA Complaints and Investigation—IMPORTANT," informed the recipients that "[t]he Travis County District Attorney's Office has recently been made aware of a complaint filed by former APD DNA analyst Cecily Hamilton" and that the "complaint was investigated internally by the Austin Police Department." Attached to the email were several documents including an "Initial written concern by Hamilton dated February 11,

2010," and an "Investigative Results Memo dated March 22, 2010." According to counsel, it was only after receiving this email that he "learned that this investigation had begun in February of 2010 and had ended with a Memo dated March 22, 2010."

Hall's counsel went on to allege that this investigation had been documented in a front-page article in the Austin American-Statesman on July 8. The article indicated that "thousands of cases could be affected," that the District Attorney had been notified of the investigation on June 23, and that "last week" she had instructed her prosecutors to "notify defense attorneys involved in any cases with DNA evidence." Counsel claimed that "the 'last week' [the District Attorney] is speaking of in the newspaper was the week of [Hall]'s re-trial."

Counsel went on to allege that the documents attached to the email he had received were not the "short synopsis of personnel problems" that prosecutors had disclosed to counsel prior to trial. Instead, counsel claimed, the documents contained allegations "regarding testing and quality assurance" and "management of the lab." Counsel included in his motion a summary of Hamilton's complaint against Carradine, which included allegations that Carradine had allowed a lab analyst with "very significant issues and problems" to perform independent DNA analysis and that Carradine had "misconstrued and misrepresented the facts about the quality assurance problems in the DNA unit to upper management."

Counsel concluded that, "[r]egardless of the truth of the matters asserted in these documents, it is clear that this was *Brady* material and any Assistant or Elected District Attorney had an immediate duty to bring the information to the attention of the Defense by providing all the documents in their possession." Hall makes the same argument on appeal: "Whether those allegations were true or not is beside the point. Substantive allegations had been made, and the

8

allegations were known by the state's counsel to have been made, and the state was obligated to inform Ms. Hall of the allegations, if for no other reason than for impeachment purposes."[9]

Because the alleged *Brady* violations were raised in the context of a motion for new trial, we review the trial court's ruling under an abuse-of-discretion standard. *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004); *Pittman v. State*, 321 S.W.3d 565, 570 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Hall*, 283 S.W.3d at 165 (citing *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006)). Under this standard, an appellate court should uphold a trial judge's ruling unless it is outside the "zone of reasonable disagreement." *Hall*, 283 S.W.3d at 165 (citing *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006)). In other words, we do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. *Charles*, 146 S.W.3d at 208. We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. *Id*. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id*.

Before addressing the merits of the motion for new trial, the State raises a procedural point concerning the motion. The State argues that Hall failed to present her motion for new trial to the district court. A motion for new trial must be "presented" to the trial court within ten days of

---

[9] There is no dispute that the State knew of the allegations made by Hamilton against Carradine. In fact, in its motion in limine filed on the day of trial, the State requested that the defense be prohibited from making "[a]ny reference to an allegation against Cassie Carradine by Cecily Hamilton."

being filed. *Gardner v. State*, 306 S.W.3d 274, 305 (Tex. Crim. App. 2009) (citing Tex. R. App. P. 21.6). The term "present," as used in this context, "means the record must show the movant for a new trial sustained the burden of actually delivering the motion for new trial to the trial court or otherwise bringing the motion to the attention or actual notice of the trial court." *Carranza v. State*, 960 S.W.2d 76, 79 (Tex. Crim. App. 1998). "This may be accomplished in several ways such as, for example, obtaining the trial court's ruling on a motion for new trial." *Id.* "[T]he presentment 'must be directed to the trial court or another authorized to act on behalf of the trial court,' and it 'may be evidenced by the judge's signature or notation on a proposed order or by a hearing date set on the docket. This list is not meant to be exhaustive, but merely suggestive as to how one may fulfill the communication requirement for presenting a motion for new trial.'" *Stokes v. State*, 277 S.W.3d 20, 22 (Tex. Crim. App. 2009) (quoting *Carranza*, 960 S.W.2d at 79). "The rationale for this requirement is the same as that which supports preservation of error generally: A trial court should not be reversed on a matter that was not brought to the trial court's attention." *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). "Presenting the motion, along with a request for a hearing, is required to let the court know that the defendant wants the trial court to act on the motion and whether the defendant would like a hearing on the motion." *Id.*

In this case, there is no entry on the district court's docket sheet regarding the motion for new trial, no hearing on the motion was set or held, there is no signature or other notation by the judge on the motion, the proposed order attached to the motion setting the matter for hearing is completely blank, there is no order in the record denying the motion for new trial, and there is no

10

indication in the record that the court had actual knowledge that the motion for new trial was filed.[10]

There is a "register of actions" in the record that includes an entry reflecting the date the motion for new trial was filed, but this appears to be nothing more than the district clerk's computer-generated record of documents that were filed in the district clerk's office and the calendar settings in the case. There is no entry on the clerk's registry showing any presentment to or action by the district court regarding the motion for new trial. The record, in short, does not reflect that the motion for new trial was ever "presented" to the district court. Hall ultimately acknowledges as much in her brief, observing, "[I]t is not clear from the record whether the motion for new trial was ever presented to the district court."[11]

Moreover, even if the motion for new trial had been presented, we could not conclude on this record that the district court abused its discretion in not granting the motion. In our prior opinion addressing Hall's previous *Brady* complaints, we explained the requirements that *Brady* imposes on the State:

> A defendant in a criminal case has no general right to pretrial discovery of evidence in the State's possession. However, under *Brady* and its progeny, the United States Supreme Court has recognized "what amounts to a federal constitutional right to certain minimal discovery." These authorities hold that "[t]o protect a criminal defendant's right to a fair trial, the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the prosecution to disclose exculpatory and impeachment evidence to the defense that is material to either guilt or punishment,"

---

[10] We also observe that there is an entry on the district court's docket sheet reflecting that a motion for new trial was filed following Hall's first trial. Thus, the absence of a notation on the docket sheet reflecting the filing of the current motion for new trial is particularly probative of the district court's lack of awareness of the current motion.

[11] In fact, this lack of presentment forms the basis of Hall's ineffective-assistance-of-counsel complaint, discussed below.

11

and that the State's failure to comply with this duty constitutes harm requiring reversal and a new trial.

*Hall*, 283 S.W.3d at 163 (internal citations omitted).  The failure to comply with this duty violates due process "irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87. However, to find reversible error under *Brady*, a defendant must show three things:  (1) the State failed to disclose evidence in its possession; (2) the withheld evidence is favorable to the defendant; and (3) the evidence is "material."  *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). The evidence may be material to either guilt or punishment.  *Brady*, 373 U.S. at 87.

The district court would not have abused its discretion in finding that the evidence at issue was not material.  As we explained in our prior opinion, undisclosed evidence is "material" to guilt or punishment "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Hall*, 283 S.W.3d at 171 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  *Id*.  In other words, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Id*. (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  Although the standard "is not a sufficiency of the evidence test," the defendant must "show[] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id*. (quoting *Kyles*, 541 U.S. at 434-35).  "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *Hampton*, 86 S.W.3d at 612

12

(quoting *United States v. Agurs*, 427 U.S. 97, 109 (1976)). "Usually, a determination concerning the materiality prong of *Brady* involves balancing the strength of the [favorable] evidence against the evidence supporting [the verdict]." *Id.* at 613. We must accordingly consider "the entire body of evidence" at trial. *Id.*

In this case, the favorable evidence had a tendency to undermine the State's DNA evidence and the credibility of the State's DNA expert, Cassie Carradine. However, on this record, we cannot conclude that there is a reasonable probability that, had such evidence been disclosed, the result of the proceeding would have been different. First, the allegations by Hamilton against Carradine related to a particular analyst under Carradine's supervision, Diana Morales. But there is no indication in the record that Morales participated in the DNA testing in Hall's case. Rather, Carradine testified that analyst Maurice Padilla "did the DNA testing" while Carradine herself "did all the technical review." Carradine testified that this meant that she "went back to all the raw data that was generated and made all [her] own interpretations . . . and verified that my results were consistent with his results." Hamilton's allegations, as far as the record reveals, implicated Carradine's supervisory and management skills, not her abilities as an analyst. Also, there is no indication in the record as to the time frame of the allegations against Carradine and whether those allegations occurred during the time period in which Hall's DNA was tested. Additionally, Hall's own DNA expert, William Watson, testified that he had independently reviewed the DNA test results himself and that he agreed with the findings regarding the presence of Hall's DNA on certain items and the absence of her DNA on other items. When asked if had found any problems with the testing procedures, Watson testified, "Nothing that stood out as a major issue, no. I can't even really think of any minor issues specifically related to the testing itself, the generation

13

of data from the samples that were tested by the laboratory." Watson added on cross-examination that Carradine "has a very good reputation as a professional" and that he, as an auditor with the agency that accredits Carradine's lab, does not have any issues with the quality of the work performed there.

Also, according to the DNA evidence presented, Hall was positively excluded as a contributor to most of the items recovered at the crime scene, and defense counsel effectively emphasized this during his cross-examination of Carradine and his direct examination of Watson. Thus, the disclosure of the favorable evidence, although it might have undermined the State's theory that DNA evidence proved Hall was present in the condominium on the night in question, could have also undermined the defense theory that the DNA evidence exonerated her.[12] For this reason,

---

[12] In fact, it was defense counsel that emphasized the DNA evidence in its closing argument, while the State discounted it. Defense counsel argued,

> We turn to those things that have no emotion, and in this case it's science because science we can trust. And in this case it's DNA, and the DNA proves what [Hall] has been proclaiming this entire time. Both experts agree that the testing and the procedures performed in this case were performed correctly. . . . And the DNA shows that on a blue towel and a shoe, only 4 loci out of 13 were consistent with [Hall] and as many as 25 percent of the Caucasian population chosen at random. . . . And of all the DNA that is found, more importantly where she is not found: the machete, the hacksaw, and the buck knife. And out of all of those items where Ms. Cave's blood is found, where Colton Pitonyak's blood is found and where a mixture of other blood is found, 18 items in total, Ms. Hall is not only not found; she is excluded. No, DNA tells us who did this. Colton Pitonyak. And how do we know? Because his DNA is in all of those items.

In contrast, the State argued,

> We spent an hour listening to their DNA expert . . . tell you that he agrees with the State's DNA expert. . . . But this evidence in this case is not . . . DNA is a piece of it, but it's not all of it. And you heard an hour going on and on and on about how no one can say that she touched the gun, and DNA doesn't prove she touched the gun.

14

defense counsel might not have wanted to present the evidence even if it had been disclosed to him. Thus, the district court could have found for this reason also that there was not a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.

Moreover, this was not a case that turned on DNA evidence. As the State emphasized during its closing argument, there was considerable evidence in the State's case against Hall that was completely independent of the DNA evidence. The evidence included the testimony of:

> Nora Sullivan, a friend of Pitonyak's, who testified that Hall had told her that she had been with Pitonyak after Cave was killed and that Hall was "trying to motivate him or urge him . . . to complete their intention" to "dismember" Cave's body.

> Ryan Martindill and Star Salzman, friends of Hall's, who testified that Hall had told them that she had gone with Pitonyak to Mexico and that they were "on vacation."

> Joseph Smith, a Deputy United States Marshall with the Lone Star Fugitive Task Force, who testified that he found video footage of Pitonyak and Hall crossing the border together into Mexico the night following the murder, that in the video, "Laura Hall was clearly driving," and that Hall was found in Mexico with Pitonyak.

> Detective Mark Gilchrest of the Austin Police Department, who testified that Pitonyak's cell phone showed a call sent to and a text message received from Hall's cell phone on the morning following the murder and that Hall's Facebook page had a favorite quotation that read, "You're part music and part blood, part thinker and part killer, and if you can find that—all of that within you and control it, then you deserve to be set apart" and "I should really be more of a horrific person. It's in the works."

> Said Aziz, a friend of Hall's, who testified that Hall had called him after she had been apprehended in Mexico and told him, "I have been all up in this shit since about like

---

We don't need DNA to prove she touched the gun. Their client told *48 Hours* she touched the gun. . . . So science does not give us the answer to what happened. It's a piece of it, but it's not the whole thing. If you only focus on the DNA, you are going to get sidetracked.

15

two hours after shit started"; that she wanted to help Pitonyak so that "he might walk"; and that, when he asked her why she wanted to help Pitonyak, she answered "that she loved him" and "that's how she rolled."

Javier Rosales, a co-worker of Hall's, who testified that Hall had told him that she was the "mastermind" of the plan for her and Pitonyak to "escape" to Mexico.

Katy Grayson, a convicted felon who had met Hall while they were in jail together, who testified that Hall had told her that "the eeriest part" of cutting up a body "was cutting through bone."

Christy Freeman, a convicted felon who had met Hall in jail, who testified that Hall had stated in a group therapy session that "the whore was just a dancer. She deserved to die."

Henriette Langenbach, another convicted felon who had met Hall in jail, who testified that Hall had told her that it was her idea to dispose of the body because Pitonyak "just couldn't think straight" and that Hall had suggested they "cut up the body by removing the hands, the feet and the head" because "those three things would be the way to identify a body."

Various other witnesses who testified to Hall's demeanor and statements that she had made while in jail.

Elizabeth Peacock, a medical examiner who performed the autopsy on Cave's body, who testified that Cave's body was subject to several post-mortem wounds, including stab wounds to the face, neck, and chest; severed hands and head, and a gunshot wound through her neck into her head.

The stepfather and mother of the victim, who provided testimony about how much they loved their daughter, how much they feared and felt threatened by Hall when she was out on bail, and how they felt safer when she was incarcerated.

The evidence also included numerous exhibits, including cell phone records showing that Hall and Pitonyak had communicated with each other following the murder, transcripts of jailhouse phone conversations between Hall and her friends and family, and an episode of the television program *48 Hours*, in which Hall was interviewed extensively and made statements that supported the State's theory of the case.

16

We conclude that the record in this case supports a finding by the district court that there is not a reasonable probability that, had the evidence concerning the issues at the forensics lab been disclosed, the result of the proceeding would have been different. Accordingly, even assuming the motion for new trial had been presented to the district court, we could not conclude that the district court abused its discretion in overruling the motion.

We overrule Hall's fourth and fifth issues.

**Effective assistance of counsel**

In her third issue, Hall claims that she was denied effective assistance of counsel "when her trial counsel wrongfully believed he had been relieved of his duty to represent Hall." In her sixth issue, Hall similarly asserts that trial counsel, believing he had become a fact witness in the motion for new trial, failed to present his motion for new trial to the district court. "The failure of such presentment," Hall claims, "denied [her] effective assistance of counsel."

Hall's arguments implicate *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a *Strickland* claim, Hall must prove by a preponderance of the evidence that counsel was ineffective. *Perez v. State*, 310 S.W.3d 890, 892 (Tex. Crim. App. 2010) (citing *Strickland*, 466 U.S. 668). There are two required components of an ineffectiveness claim: performance and prejudice. *Id*. First, Hall must prove that counsel's performance was deficient. *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892. To satisfy this prong of the analysis, Hall "must show that counsel's representation fell below an objective standard of reasonableness" based upon "prevailing professional norms." *Strickland*, 466 U.S. at 688; *Perez*, 310 S.W.3d at 893. For this performance inquiry we consider all of the circumstances, with "a strong presumption that counsel's conduct falls

17

within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89; *Perez*, 310 S.W.3d at 893.

"Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To succeed under the prejudice component, Hall "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, she must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id*. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id*. at 696.

There is nothing in the record to support Hall's theory that trial counsel "wrongfully believed he had been relieved of his duty to represent Hall." The record does not indicate what counsel believed or, for that matter, what counsel did after filing the motion for new trial and motion to withdraw. There are no affidavits from Hall, counsel, or anyone else shedding light on the matter. Although counsel, in his motion for new trial, asked to be allowed to withdraw because he had become a fact witness, there is no indication in the record that following those filings, he ceased in his representation of Hall. Absent evidence to the contrary, we must presume counsel

18

continued in his representation until the district court allowed him to withdraw. *See Cooks*, 240 S.W.3d at 911.

As for the fact that counsel did not present the motion for new trial to the district court, the record is silent as to the reasons for counsel's decision. When the record is silent regarding the reasons for counsel's decisions, we will not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). We cannot say on this record that no competent attorney would have decided not to present the motion for new trial. Counsel could have decided, for the reasons discussed above or for other reasons, that he did not have sufficient evidence to support his motion or that the motion for new trial had little to no chance of success. There is also the possibility that counsel filed the motion for new trial simply to extend the appellate deadline or that, after filing the motion, counsel spoke with his client about the motion and was told by her that, for whatever reason, she did not wish to pursue the motion further. *See Oldham*, 977 S.W.2d at 363; *see also Venzor v. State*, No. 04-05-00808-CR, 2006 Tex. App. LEXIS 6149, at *4-5 (Tex. App.—San Antonio July 19, 2006, no pet.) (mem. op., not designated for publication) (declining to find ineffective assistance when record did not contain specific explanation for counsel's decision to not present motion for new trial and observing that "a motion for new trial is often filed exclusively to extend the appellate time limits"). On this record, we can do nothing but speculate as to the reasons for counsel's conduct. Such speculation does not satisfy the requirements of *Strickland*. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

We also cannot conclude on this record that Hall proved that she was prejudiced by counsel's decision not to present the motion for new trial. For the reasons discussed above,

the record fails to show a reasonable probability that, but for counsel not presenting the motion for new trial to the district court, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 693-96.

We overrule Hall's third and sixth issues.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   August 24, 2011

Do Not Publish

20